IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

United States Courts Southern
District of Texas
FILED

*September 19, 2022*

Nathan Ochsner, Clerk of Court

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) |
| Plaintiff, | ) ) |
| v. | ) ) |
| MAURICIO CHAVEZ, GIORGIO BENVENUTO, and CryptoFX, LLC, | ) ) ) ) |
| Defendants, | ) ) |
| CBT GROUP, LLC, | ) ) ) |
| Relief Defendant. | ) ) |

Civil Action No. **4:22cv3359**

**FILED UNDER SEAL**
JURY TRIAL DEMANDED
**UNSEALED 9/29/2022**

**PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION,**
***EX PARTE* TEMPORARY RESTRAINING ORDER, ASSET FREEZE,**
**APPOINTMENT OF RECEIVER, AND OTHER ANCILLARY**
**EMERGENCY RELIEF, AND BRIEF IN SUPPORT**

i

## TABLE OF CONTENTS

TABLE OF CONTENTS ......................................................................................................... i-ii

TABLE OF AUTHORITIES ............................................................................................... iii-vi

INTRODUCTION.................................................................................................................... 1

STATEMENT OF FACTS ....................................................................................................... 2

I.   Chavez Operates CryptoFX as a Crypto Learning Academy to Obtain Investor Funds .......... 2

II.  Defendants Defrauded CryptoFX Investors................................................................... 4

III. Defendants Misappropriated the Vast Majority of CryptoFX Investor Funds .......................... 5
     a.  Minimal Crypto Asset and Foreign Exchange Trading ............................................ 5
     b.  More than $7 Million Went to the CBT Group for Undisclosed Purposes .............. 6
     c.  Most Investor Returns Were Actually Ponzi Payments........................................... 7
     d.  Chavez Spent Nearly $2 Million in Personal Expenses........................................... 7

IV.  Founders Circle Fraud................................................................................................ 8

V.   Defendants Continue to Raise Investor Funds ............................................................. 8

ARGUMENT ........................................................................................................................... 9

I.   The Court Should Issue an Ex Parte Temporary Restraining Order and a Preliminary
    Injunction to Halt the Ongoing Fraudulent Offering ................................................... 9

    A.  The Legal Standard Applicable to Temporary and Preliminary Relief Sought by the
       SEC ...................................................................................................................... 9

    B.  The Commission Is Likely to Succeed on the Merits of this Case .............................. 10

       1. The Defendants Are Violating the Antifraud Provisions of the Federal
          Securities Laws ................................................................................................. 10
           a. *Investments Pursuant to the CryptoFX Venture Agreement Are*
             *Securities*................................................................................................... 11
           b. *Violations of Section 17(a)(2) and Section 10(b) and Rule 10-*
             *5(b)*........................................................................................................ 12
           c. *Violations of Sections 17(a)(1) and (3) and Rules 10b-5(a) and*
             *(c)*........................................................................................................... 14
           d. *Benvenuto Aided and Abetted Chavez's and CryptoFX's*
             *Violations*............................................................................................... 15

i

2. Defendants Are Violating the Securities Registration Provisions of the
Federal Securities Laws ................................................................................16

3. Chavez Violated Sections 206(1) and 206(2) of the Advisers Act .................17

C.  The Defendants Are Reasonably Likely to Continue their Illegal Conduct ...............19

II.  The Court Should Grant Additional Ex Parte Relief ................................................................20

A.  It Is Appropriate to Grant the Requested Relief on an Ex Parte Basis ........................20

B.  An Asset Freeze Is Necessary .......................................................................................21

C.  Appointment of Receiver ...............................................................................................22

D.  Other Necessary Ancillary Emergency Relief ...............................................................23
1. Accounting ...............................................................................................23
2. Document Preservation .............................................................................24
3. Expedited Discovery ................................................................................24
4. Alternative Service ...................................................................................24

CONCLUSION ................................................................................................................................25

# TABLE OF AUTHORITIES

**Cases**

*Aaron v. SEC,*
    446 U.S. 680 (1980) ........................................................................................ 11, 14

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) ........................................................................................ 11, 13

*Broad v. Rockwell Int'l Corp.,*
    642 F.2d 929, 961 (5th Cir. 1981) ..............................................................................17

*CFTC v. Muller,*
    570 F.2d 1296 (5th Cir. 1978) ...................................................................... 21, 22

*Esbitt v. Dutch-American Mercantile Corp.,*
    335 F. 2d 131 (2d Cir. 1964) .......................................................................................22

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976) .....................................................................................................11

*In re San Vicente Med. Partners Ltd.,*
    962 F.2d 1402 (9th Cir. 1992) ....................................................................................22

*Janus Capital Grp., Inc. v. First Derivative Traders,*
    564 U.S. 135 (2011) .....................................................................................................14

*Living Bens. Asset Mgmt., L.L.C. v. Kestrel Aircraft Co.,*
    916 F.3d 528 (5th Cir. 2019) ......................................................................................12

*Long v. Shultz Cattle Co.,*
    881 F.2d 129 (5th Cir. 1989) ......................................................................................12

*Lorenzo v. SEC,*
    139 S. Ct. 1094 (2019) ........................................................................... 10, 14

*Newton & Co. v. Tex. Comm. Bank*
    630 F. 2d 1111 ..............................................................................................................13

*Reves v. Ernst & Young,*
    494 U.S. 56 (1990) .......................................................................................................11

*SEC v. American Bd. Of Trade, Inc.,*
    830 F, 2d 431 (2d Cir. 1987) ......................................................................................22

*SEC v. AmeriFirst Funding,*
    2007 WL 2192632 (N.D. Tex. July 31, 2007) ...................................................... 22

*SEC v. Blatt,*
    583 F.2d 1325 (5th Cir. 1978) ................................................................. 9, 19, 20

*SEC v. Capital Gains Research Bureau, Inc.,*
    375 U.S. 180, 191-92 (1963) ................................................................17

*SEC v. Carter,*
    2020 WL 6304889 (E.D. Tex. Oct. 28, 2020) ................................................ 14

*SEC v. Cavanagh,*
    155 F.3d 129 (2d Cir. 1998) ................................................................ 9

*SEC v. Continental Tobacco Co. of S.C.,*
    463 F.2d 137 (5th Cir. 1972) ................................................................16

*SEC v. Current Fin. Servs. Inc.,*
    783 F. Supp. 1441 (D.D.C. 1992) ................................................................23

*SEC v. First Fin. Group of Tex.,*
    645 F.2d 429 (5th Cir. 1981) ................................................................ 10, 22

*SEC v. Int'l Swiss Invs. Corp.,*
    895 F.2d 1272 (9th Cir. 1990) ................................................................ 247

*SEC v. Jackson,*
    908 F. Supp. 2d 834, 863-64 (S.D. Tex. 2012) ................................................................15

*SEC v. Manor Nursing Ctrs., Inc.,*
    458 F.2d 1082 (2d Cir. 1972) ................................................ 13, 14, 20, 22, 24

*SEC v. Materia,*
    745 F.2d 197 (2d Cir. 1984) ................................................................ 20

*SEC v. Mgmt. Dynamics, Inc.,*
    515 F.2d 801 (2d Cir. 1975) ................................................................9

*SEC v. One or More Unknown Traders in Common Stock of Certain Issuers,*
    2009 WL 3233110 (E.D.N.Y. Oct. 2, 2009) ................................................................ 17

*SEC v. Oxford Capital Secs., Inc.,*
    794 F. Supp. 104 (S.D.N.Y. 1992) ................................................................ 24

*SEC v. Reynolds, No. 3:08-CV-0438-B,*
    2008 WL 4561560 (N.D. Tex. Oct. 9, 2008) ................................................................ 21

*SEC v. Ripple Labs, Inc.,*
    No. 1:20-cv-10832 (S.D.N.Y. 2020)................................................................18

*SEC v. Sentinel Mgmt. Grp., Inc.,*
    2012 WL 1079961, at *13 (N.D. Ill. March 30, 2012)................................................................19

iv

*SEC v. Steadman*,
    967 F.2d 636, 641-42 (D.C. Cir. 1992)...................................................................17

*SEC v. Straub*,
    921 F.Supp.2d 244 (S.D.N.Y. 2013) ................................................................. 17

*SEC v. Sullivan*,
    68 F. Supp. 3d 1367 (D. Colo. 2014) ................................................................ 14

*SEC v. Treadway*,
    430 F. Supp. 2d 293, 336 (S.D.N.Y. 2006)........................................................15

*SEC v. Unifund SAL*,
    910 F.2d 1028 (2d Cir. 1990) ................................................................. 9, 21, 24

*SEC v. W.J. Howey Co.*,
    328 U.S. 293 (1946) ...........................................................................................11

*SEC v. Zale Corp.*,
    650 F.2d 718 (5th Cir. 1981) ............................................................................ 19

*Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*,
    365 F.3d 353 (5th Cir. 2004) .............................................................................11

*Swenson v. Engelstad*,
    626 F.2d 421 (5th Cir. 1980) ............................................................................16

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) .................................................................................... 11, 13

*U.S. v. Elliott*,
    62 F.3d 1304, 1311 (11th Cir. 1996) ................................................................18

*U.S. v. Lay*,
    612 F.3d 440, 446-47 (6th Cir. 2010) ...............................................................18

*U.S. v. Miller*,
    833 F.3d 274, 282 (3d Cir. 2016)......................................................................18

*U.S. v. Ogale*,
    378 Fed. App'x 959, 960 (11th Cir. 2010) ..................................................17, 18

*Williamson v. Tucker*,
    645 F.2d 404 (5th Cir. 1981) ............................................................................ 11

**Statutes**

<u>**Securities Act of 1933**</u>

Section 2 [15 U.S.C. § 77b] .................................................................................... 11

Section 5(a) [15 U.S.C. § 77e(a)] ...................................................................... 2, 16

Section 5(c) [15 U.S.C. § 77e(c)] ...................................................................... 2, 16

Section 17(a) [15 U.S.C. § 77q(a)] .................................................................... 2, 10

Section 20 [15 U.S.C. § 77t] .................................................................................. 2, 9

Section 21 [15 U.S.C. § 77u] .................................................................................... 9

<u>**Securities Exchange Act of 1934**</u>

Section 3 [15 U.S.C. § 78c] ................................................................................... 11

Section 10(b) [15 U.S.C. § 78j] .........................................................................2, 10

Section 21(d) [15 U.S.C. § 78u] ........................................................................... 2, 9

<u>**Advisers Act of 1940**</u>

Sections 206(1) and (2) [15 U.S.C. §§ 80b-6(1)-(2)] .............................................. 2, 17

Section 202(a)(11) [15 U.S.C. §§ 80b-2]...........................................................18, 19

Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)]........................................2

<u>**Rules**</u>

Rule 10b-5 [17 C.F.R. §240.10b-5] .................................................................... 2, 10

<u>**Other**</u>

Fed. R. Civ. P. 65 .......................................................................................2, 9, 20, 21

Plaintiff U.S. Securities and Exchange Commission (the "SEC" or "Commission") submits this Motion for Preliminary Injunction, *Ex Parte* Temporary Restraining Order, Asset Freeze, Appointment of Receiver, and Other Ancillary Emergency Relief, and Brief in Support, to halt an ongoing securities fraud by Defendants Mauricio Chavez, Giorgio Benvenuto, CryptoFX, LLC ("CryptoFX"), and Relief Defendant CBT Group, LLC ("CBT Group") that is harming investors and dissipating investor funds, and to protect the ability to recover assets for harmed investors.

## **INTRODUCTION**

Since the beginning of 2020, the Defendants have raised at least $12 million from investors using repeated material misstatements of fact to solicit investments in crypto asset and foreign exchange trading. Chavez and CryptoFX used a purported crypto learning academy, in-person seminars, YouTube, and other social-media platforms to solicit investors. Chavez and CryptoFX engaged in general solicitation, offering to sell securities to mostly Latino-immigrant investors with whom Chavez had little or no preexisting, substantive relationships, including unaccredited investors, in multiple states. Benvenuto also personally solicited an investment in CryptoFX.

Instead of using investor funds to conduct crypto asset and foreign exchange trading as promised, Chavez and Benvenuto diverted the vast majority of the proceeds of these unregistered sales of securities to wholly unrelated purposes, including real estate development, personal expenditures, and Ponzi payments back to investors.

Because of Defendants' extensive fraud and misappropriation, and because the fraud is ongoing, the SEC seeks emergency relief in the form of an ex parte temporary restraining order, asset freeze, receivership order, and other emergency relief to halt the Defendants' fraudulent securities offering and to preserve assets for the benefit of investors.

\*       \*       \*       \*

1

Under Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77t(b)], Section 21(d)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78u(d)(1)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)], Congress has expressly authorized the Commission to seek "a permanent or temporary injunction or restraining order" upon "a proper showing" that the defendant "is engaged or is about to engage" in violations of the federal securities laws. Thus, to halt Defendants' ongoing violations, the Commission moves pursuant to this statutory authority and Rule 65(b) of the Federal Rules of Civil Procedure for the following *ex parte* orders:

(1) Entering a temporary restraining order, and thereafter a preliminary injunction, to restrain and enjoin, immediately and pending final adjudication on the merits, Defendants from violating Sections 5(a), 5(c) (Chavez and CryptoFX only), and 17(a) of the Securities Act [15 U.S.C. §§77e(a), 77e(c), and 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5], and Sections 206(1) and (2) of the Advisers Act [15 U.S.C. §§ 80b-6(1)-(2)] (Chavez only); (2) Freezing Defendants' Assets; (3) Appointing a Receiver; (4) Requiring Defendants to provide an interim accounting; (5) Preventing the destruction of documents; (6) Authorizing expedited discovery; and (7) Authorizing service by alternative means.

## STATEMENT OF FACTS

### I.     Chavez Operates CryptoFX as a Crypto Learning Academy to Obtain Investor Funds

Mauricio Chavez is the founder and CEO of CryptoFX. (Testimony of Mauricio Chavez[1]

---

[1] Chavez gave investigative testimony to SEC staff on February 10, 2022. After negotiating a second testimony date on June 8, 2022, Chavez's counsel told the Staff he would refuse to testify, citing his privilege against self-incrimination under the Fifth Amendment. He agreed to sign a declaration to that effect that included a list of the matters on which he would assert his privilege. (Declaration of Jillian Harris ("Harris Decl."), ¶ 8, APP. 003-004).

("Chavez Test."), 27:4, 32:6, APP. 019-020).[2] Since founding the company in early 2020, Chavez has marketed CryptoFX as a crypto asset learning academy, and has also used the company to obtain funds from investors who expected Chavez and CryptoFX to earn them investment returns through crypto asset and foreign exchange trading. (Harris Decl., ¶¶ 10, 11, APP. 004; Chavez Test., 37:19-38:19, APP. 021). Chavez is CryptoFX's sole trader of crypto assets. (*Id.*, ¶¶ 4, 11, APP. 002-004). Chavez and CryptoFX offered class packages ranging in cost from $499.99 to $1,499.99. (Harris Decl., Ex D, APP. 004, 099). Chavez used these classes to solicit further investments through CryptoFX from a pool of potential investors overwhelmingly made up of Latino immigrants. (Chavez Test., 46:7-10, APP. 023). As part of his pitch, Chavez told investors that he wanted to empower the common man and create wealth within the Latino community by providing passive income. (Benvenuto Test., 35:9-14, APP. 067).

Chavez and CryptoFX solicited investments both from CryptoFX students and those who did not enroll in the company's classes. (Harris Decl., ¶ 11, APP. 004; Chavez Test., 39:9-40:3, APP. 022). Since January 2020, CryptoFX raised at least $12 million from as many as 5,000 investors. (Declaration of Carol Hahn ("Hahn Decl."), ¶ 11, APP. 220; Chavez Test., 31:15-19, APP. 020). Chavez and CryptoFX signed up investors using short contracts, labeled Venture Agreements, that set forth the amounts contributed by investors and established a schedule under which CryptoFX would pay investors returns derived from the proceeds of CryptoFX's crypto asset and foreign exchange trading. (Harris Decl., ¶ 10, Ex. E, APP. 107-109). Before partnering with Chavez in the CBT Group, Benvenuto was a CryptoFX investor. (Benvenuto Test., 35:17-36:22, APP. 067-68). Benvenuto signed up for a six-month contract to be paid a return on Chavez's trading in the crypto markets. (*Id.*)

---

[2] Citations to the attached Appendix are referenced herein as "APP. ###."

Chavez and CryptoFX also used a two-tiered referral bonus system to boost investments in CryptoFX's Venture Agreements. (Harris Decl., ¶ 11, APP. 004; Chavez Test. 92:20-93:25, APP. 033.1). They encouraged CryptoFX investors to help solicit additional investments by offering "direct sponsor" payments of 7% of investments made by friends that they referred to CryptoFX. (*Id.*). Direct-sponsor investors could further benefit from downstream investment by referrals of their referred investors, earning 3% of all such second-level investments. (*Id.*)

Additionally, Chavez and CryptoFX offered a purported special tier of access called the Founders Circle. (Harris Decl., ¶¶ 17-20, APP. 006; Chavez Test. 49:9 *et seq.*, APP. 024, *et seq.*). According to Chavez, Founders Circle members would have an increased level of access to trades he personally executed. (*Id.*) Some Founders Circle members traded in their own crypto wallets using this information, and Chavez and CryptoFX also traded on behalf of Founders Circle members. (Chavez Test., 50:12-51:25). To deceive the Founders Circle members into believing they earned higher returns, Chavez deposited larger Ponzi payments into those investors' crypto wallets. (Harris Decl., ¶ 20, APP. 006; Chavez Test., 78:17-81:12; 82:13-83:21, APP. 031-033).

## II.    Defendants Defrauded CryptoFX Investors.

While Chavez claimed to offer a path to self-improvement to the Latino community, he was actually victimizing a marginalized group with lies, omissions, and a deceptive scheme. Chavez used the following misrepresentations and omissions in soliciting and obtaining investments in CryptoFX's offerings:

- Chavez claimed to a crowd of potential investors at a Crowne Plaza hotel in Houston in or around August 2022, that CryptoFX had "literally achieved what nobody in the world has achieved in the crypto-economy industry," and that his small office had "literally made over five millionaires last year." (Harris Decl., Ex. L, APP. 0174). In truth, the returns paid to investors during that time were simply Ponzi payments recycling existing investor funds. (Hahn Decl., ¶¶ 16-26, APP. 021-026).

4

- At least as early as May 2020, Chavez and CryptoFX enrolled investors using Venture Agreements in which CryptoFX stated that investors "WILL BE RECEIVING REWARD FOR MY CONTRIBUTION IN THE FORM OF BITCOIN" with options of payments every one, three, six, or twelve months. (Harris Decl., Exs. E, G, APP. 107-109; 115-116). These Venture Agreements included the following guarantee: "IN THE EVENT THAT CRYPTOFX, LLC LOSES THE MONEY OR CANNOT CONTINUE TO FULFILL PAYMENTS, CRYPTOFX, LLC AGREES TO REPAY TOTAL PRINCIPAL AMOUNT CONTRIBUTED IN A PERIOD NO LATER THEN 24 – 36 MONTHS WHICH BOTH PARTIES HAVE AGREED TO BE SETTLED OUTSIDE OF ANY COURTS." (*Id.*) In fact, as Chavez and CryptoFX knew, actual crypto asset and foreign exchange trading proceeds were insufficient to make any such promise. (Hahn Decl., ¶¶ 17-19, APP. 222-223).

- At least in May 2021, Chavez and CryptoFX enrolled investors using Venture Agreements stating that "WE ARE TAKING YOUR MONEY AND INVESTING IT IN OUR BEHALF. IF WE RECEIVED ENOUGH RETURN ON CRYPTO CURRENCY, WE WILL REPAY THE STUDENT A PORTION OF THE TOTAL TUITION." In fact, the vast majority of investor funds actually went to purposes unrelated to crypto investing, including real estate investments, personal spending, and Ponzi payments. (*Id.*, ¶¶ 19-28, APP. 223-227).

- Soliciting investments in July 2020, Chavez and CryptoFX claimed to pay 20% profits *per month* on crypto asset investments. (Harris Decl., ¶ 10, APP. 004; Benvenuto Test., 23:6-9, 35:17-36:8, APP. 066.1-068). In fact, as Chavez and CryptoFX knew, actual crypto asset and foreign exchange trading proceeds were insufficient to make any such promise. (Hahn Decl., ¶¶ 17-19, APP. 222-223).

- CryptoFX used a PowerPoint presentation in live meetings with potential investors including a table of potential earnings that shows investors earning back nearly half of their investments as profit *every* three months and 90% *every* six months. (Harris Decl., Ex. D, APP. 101). While Chavez claims that these potential numbers are based on the previous performance of CryptoFX (Chavez Test. 91:18-92:12, APP. 033.1), in fact, as Chavez and CryptoFX knew, actual crypto asset and foreign exchange trading proceeds were insufficient to make any such promise. (Hahn Decl., ¶¶ 17-19, APP. 222-223).

- The Defendants never disclosed that the vast majority of the funds contributed by investors were actually being used for unrelated purposes, personal spending, and Ponzi payments as described below. (Harris Decl., Exs. E, G, APP. 107-109; 115-116). Likewise, the Defendants never disclosed that less than 10% of investor funds was ever used in crypto asset or foreign exchange trading. (*Id.*).

- Benvenuto solicited an investor in November 2021 who invested $100,000 with CryptoFX. (Benvenuto Test., 190:16-22, APP. 088.1). Benvenuto immediately contacted Chavez and asked that the investor's investment be diverted to the CBT Group to fund real estate purchases unrelated to crypto asset or foreign exchange trading. (*Id.*, 190:16-191:192:3, APP. 088.1-088.3).

- At a CryptoFX seminar in Metairie, Louisiana on June 6, 2022, CryptoFX representatives claimed that Chavez would obtain incredible rates of return by trading in crypto assets, potentially doubling investors' money in six months. (Declaration of Omar Xavier ("Xavier Decl."), ¶ 7, APP. 234-235). In fact, as Chavez and CryptoFX knew, actual crypto asset and foreign exchange trading proceeds were insufficient to make any such promise. (Hahn Decl., ¶¶ 17-19, APP. 222-223).

**III.    Defendants Misappropriated the Vast Majority of CryptoFX Investor Funds**

Rather than use investor funds to make crypto asset and foreign exchange trades, the Defendants used the vast majority of investor funds for undisclosed purposes.

### a.    Minimal Crypto Asset and Foreign Exchange Trading

While the Venture Agreements only disclose that investor funds would be used in foreign exchange and crypto asset trading (Harris Decl., Ex. E, APP. 109), Chavez used less than 10% of the more than $12 million raised from investors for crypto asset and foreign exchange trading. (Hahn Decl., ¶ 18, APP. 223). For the small amount of crypto asset trading that they conducted, Chavez and CryptoFX used Coinbase, an online platform for buying selling, transferring, and storing cryptocurrencies. (*Id.*, ¶¶ 10, 17, 18, APP. 220, 222-223). Coinbase records reveal that Defendants only sent $488,855 of investor funds to Coinbase. (*Id.*, ¶ 18, APP. 223). Chavez and CryptoFX also sent a total of $416,500 to a third party for potential foreign exchange trading. (*Id.*). The total amount of investor funds used for crypto asset and foreign exchange trading – $905,355 – represents less than 8% of investor funds raised for those purposes. (*Id.*).

### b.    More than $7 million Went to the CBT Group for Undisclosed Purposes

In or around November 2020, Chavez and Benvenuto began to misappropriate CryptoFX investor funds by transferring funds to the CBT Group, a real estate company that they owned and controlled. (Harris Decl., ¶ 13, APP. 005). CBT Group had no source of income except for CryptoFX investor funds or potential investor funds.[3] (Hahn Decl., ¶ 22, APP. 224-225). While

---

[3] While Benvenuto testified that all CBT Group funds came from CryptoFX, about $800,000 did not match the

Chavez has given conflicting testimony about whether investors knew their funds could be diverted, neither the CryptoFX presentation materials nor the Venture Agreements disclosed that Defendants would divert a substantial portion of investor funds to real estate purchases. (Harris Decl., ¶ 13, Ex. D, E, APP. 092, *et seq.*, 107-109). As Bevenuto used CryptoFX investor funds to purchase real estate through CBT Group, Benvenuto consistently urged Chavez to "funnel" investor funds to the CBT Group account that Benvenuto controlled. (*Id.*, ¶ 14, Ex. F, APP. 111-113). In addition, Benvenuto personally solicited a friend to invest in CryptoFX and, upon her investment of $100,000, he immediately contacted Chavez and instructed that he divert the investment to CBT Group to purchase real estate. (*Id.*, 190:16-191:192:3, APP. 088.1-088.3). In all, Chavez and Benvenuto poured at least more than $7 million in CryptoFX investor funds into the CBT Group. (Hahn Decl., ¶ 22, APP. 224-225).

Under the control of Chavez and Benvenuto, CBT Group used most of the diverted investor funds to acquire and develop real estate ($4,807,491) and to make Ponzi payments to CryptoFX investors ($1,268,000). (*Id.*). They also spent investor funds on legal fees ($826,188), loan payments for a bridge loan ($122,000), office rent ($90,000), furniture ($55,487), security services ($27,848), and retail purchases ($23,997). (*Id.*). Finally, Benvenuto received at least $260,150 from the CBT Group Bank Accounts. (*Id.*).

### c. Most Investor Returns Were Actually Ponzi Payments

While Chavez personally claimed that CryptoFX had minted several crypto trading millionaires, the vast majority of "profits" paid to investors were actually just recycled investor funds. (Hahn Decl., ¶ 18-19, APP. 223). Of the approximately $2.7 million in "returns" distributed by CryptoFX, about $1.5 million came from investor funds sitting in CryptoFX accounts and just

---

pattern of investor funds coming into the CBT Group.

under $1.3 million came from CBT Group accounts. (*Id.*). When a potential investor at a CryptoFX seminar confronted CryptoFX representatives about how the returns were generated and whether CryptoFX was a Ponzi scheme, the representatives were hostile to the potential investor's questions, kicked him out of the seminar, and followed him to his car. (Xavier Decl., ¶ 11, APP. 235).

### d.   Chavez Spent Nearly $2 Million of Investor Funds on Personal Expenses

Chavez also spent at least $1,446,953 from CryptoFX investor funds on additional expenses unrelated to crypto asset and foreign exchange transactions, including $460,594 on cars, $267,623 in credit card payments, $196,513 on retail purchases (including $100,000 at luxury retailers such as Saks Fifth Avenue), $181,996 paid to the Post Oak Hotel (a luxury hotel that Chavez paid monthly), $110,358 on travel, $100,935 at restaurants, over $19,000 on jewelry, and over $15,000 at adult-entertainment establishments. (Hahn Decl., ¶ 21, APP. 224). In addition, Defendants appear to have paid $30,000 to purchase a hair salon in Houston and $540,000 to purchase a single-family home in the name of Chavez's wife. (*Id.*, ¶ 20-21, APP. 223-224). Defendants did not disclose to investors that their funds would be used in this manner.

## IV.   Founders Circle Fraud

Starting in May 2020, Chavez formed the "elite" Founders Circle classes for select CryptoFX investors to allegedly teach students how to use Chavez's personalized trading strategies – and also trade on their behalf – to achieve greater returns. (Harris Decl., ¶ 17, APP. 006; Chavez Test. 49:2-50:22, APP. 024). But Chavez deceived these novice students. After teaching them how to open up digital wallets and execute trades in several crypto asset securities, Chavez deposited Ponzi payments into those wallets to give the appearance that his trading strategies produced greater returns. (*Id.*; Chavez Test., 170:21 - 171:20, APP. 043.1-044).

8

**V.     Defendants Continue to Raise Investor Funds**

Defendants continue to raise funds for purported investments in crypto assets and foreign exchange trading. CryptoFX continues to promote itself on social media outlets such as TikTok, Facebook, Twitter, and LinkedIn. (Harris Decl., ¶ 36, APP. 011). CryptoFX currently uses a live website to solicit new investors. (*Id.*, ¶ 37, APP. 011-012). CryptoFX is also holding live seminars soliciting investors in multiple cities and states across the country. (*Id.*, ¶ 33, 34, APP. 011).

<strong><u>ARGUMENT</u></strong>

**I.     The Court Should Issue an *Ex Parte* Temporary Restraining
        Order and a Preliminary Injunction To Halt the Ongoing Fraudulent Offering**

**A.     The Legal Standard Applicable to Temporary
        and Preliminary Relief Sought by the SEC**

Section 20(b) of the Securities Act [15 U.S.C. §77t(b)] and Section 21(d)(1) of the Exchange Act [15 U.S.C. §78u(d)(1)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)] expressly authorize the Commission to seek and a court to enter "a permanent or temporary injunction or restraining order" upon "a proper showing" that the defendant "is engaged or is about to engage" in violations of the federal securities laws. Federal courts have broad equitable powers enabling them to fashion appropriate remedies necessary to grant full relief, including injunctions and asset freezes. *See SEC v. Blatt*, 583 F.2d 1325, 1335-1336 (5th Cir. 1978). Rule 65(b) of the Federal Rules of Civil Procedure provides that a court may grant an *ex parte* temporary restraining order to prevent immediate and irreparable injury, loss, or damage. FED. R. CIV. P. 65(b).

Because the Commission is "not . . . an ordinary litigant, but . . . a statutory guardian charged with safeguarding the public interest in enforcing the securities laws," its burden to secure temporary or preliminary relief is less than that of a private party. *SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975). The Commission need not show irreparable injury, the balance of equities weighing in its favor, or lack of an adequate remedy at law. *Id.; see also SEC*

9

*v. Unifund SAL*, 910 F.2d 1028, 1035 (2d Cir. 1990). Rather, the Commission is entitled to entry of temporary and preliminary injunctive relief against future securities law violations upon "a substantial showing of likelihood of success as to both a current violation and the risk of repetition." *SEC v. Cavanagh*, 155 F.3d 129, 132 (2d Cir. 1998); *see also* 15 U.S.C. §77t(b); 15 U.S.C. §77u(d). Thus, when the Commission establishes (i) a prima facie showing of violations and (ii) the likelihood that such violations will continue, issuance of a preliminary injunction is appropriate. *See SEC v. First Fin. Group of Tex.*, 645 F.2d 429, 434-35 (5th Cir. 1981).

As demonstrated below, the Commission meets this burden because the evidence establishes that Defendants violated the antifraud and securities registration provisions of the federal securities laws and that they will likely continue to defraud investors absent the injunctive relief.

**B.     The Commission Is Likely to Succeed on the Merits of its Case**

1.     The Defendants Are Violating the
       Antifraud Provisions of the Federal Securities Laws

Section 17(a) of the Securities Act makes it unlawful, in the offer or sale of securities, to (1) employ any device, scheme, or artifice to defraud; (2) to obtain money or property by means of any material misstatement or omission; or (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit. 15 U.S.C. § 77q(a).  Section 10(b) of the Exchange Act prohibits using a manipulative or deceptive device or contrivance in connection with the purchase or sale of a security. 15 U.S.C. § 78j(b). Rule 10b-5 thereunder makes it unlawful, in connection with the purchase or sale of a security: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business

10

which operates or would operate as a fraud or deceit upon any person. 17 C.F.R. § 240.10b-5. In *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101-102 (2019), the Supreme Court held that these antifraud provisions are "expansive" and "capture a wide range of conduct."

A violation of Section 17(a)(2) and Rule 10b-5(b) occurs if the misrepresented or omitted facts are material. Information is material if there is a substantial likelihood that a reasonable investor would consider the information important in his or her investment decision, and would view it as having significantly altered the total mix of available information. *See Basic Inc. v. Levinson*, 485 U.S. 224, 231-32 (1988); *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976). Section 17(a)(1) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder require a showing of scienter, while Sections 17(a)(2) and (3) of the Securities Act require a showing of at least negligence. *See Aaron v. SEC*, 446 U.S. 680, 701-02 (1980). Scienter is the "mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12 (1976). In the Fifth Circuit, scienter may be established by showing that the defendant acted intentionally or with severe recklessness. *See Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (scienter is an "'intent to deceive, manipulate, or defraud' or 'that severe recklessness' in which the 'danger of misleading buyers or sellers is either known to the defendant or so obvious that the defendant must have been aware of it.'") (citations omitted).

> a.     *CryptoFX Investments are Securities*

The investments that Defendants sold pursuant to the Venture Agreements are securities because they are investment contracts. *See* 15 U.S.C. §77b(a)(1); 15 U.S.C. §78c(a)(10). An investment contract qualifies as a security if it meets three requirements: "(i) an investment of money; (ii) in a common enterprise; and (iii) on an expectation of profits to be derived solely from the efforts of individuals other than the investor." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99

(1946); *Williamson v. Tucker*, 645 F.2d 404, 417-418 (5th Cir. 1981).   In applying these requirements, the Supreme Court has directed courts to disregard "legal formalisms" and instead focus on "the economics of the transaction." *Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990).   In the Fifth Circuit, courts considering the existence of a common enterprise use the "broad vertical commonality test" in which "the second and third prongs of the *Howey* test may in some cases overlap to a significant degree." *Living Bens. Asset Mgmt., L.L.C. v. Kestrel Aircraft Co.*, 916 F.3d 528, 536 (5th Cir. 2019) (quoting *Long v. Shultz Cattle Co.*, 881 F.2d 129, 140-41 (5th Cir. 1989)).   Under the broad vertical commonality test, "the necessary interdependence may be demonstrated by the investors' collective reliance on the promoter's expertise." *Long*, 881 F.2d at 141.   Here, investors invested money and had no role in managing or controlling CryptoFX or Chavez. The investors' fortunes depended solely on the efforts and expertise of Chavez's trading. Therefore, broad commonality exists, and these investments are securities.

Because Defendants made the misstatements and participated in the fraudulent conduct described herein to induce investors to invest in CryptoFX securities, their misstatements and conduct were in connection with the purchase or sale of a security and in the offer or sale of a security.

   *b.*  *Violations of Section 17(a)(2) and Section 10(b) and Rule 10b-5(b)*

Defendants have violated, and continue to violate, Section 17(a)(2) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder because, as set forth above, they (i) made multiple misstatements, (ii) the misstatements were material, (iii) the misstatements were made in connection with the purchase or sale of a security (and in the offer or sale of a security), and (iv) acted with scienter.[4]

---

[4] Benvenuto is charged with violating Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder, but not Section 17(a)(2) of the Securities Act.

Chavez and CryptoFX repeatedly claimed to be investing in the crypto asset and foreign exchange trading markets on behalf of their investors.  Benvenuto personally raised $100,000 from a single CryptoFX investor – making sure that he would get the benefit of CryptoFX's referral-payment system.  (Harris Decl., Ex. L, APP. 113.1-113.2).  As demonstrated herein, they were actually using the vast majority of investor funds for completely unrelated purposes, including real estate acquisition and personal expenditures.  Egregiously, the Defendants used a significant portion of investor funds to make Ponzi payments back to investors, enabling them to parade happy investors through their seminars to solicit more investments from other unsuspecting investors.  While Defendants were claiming to have created millionaires in the Latino community, they were not actually creating market returns for their investors and they knew their reported results were grossly inflated.  Chavez and CryptoFX also lied about their experience in the crypto industry, claiming on their website many years of experience.

The false and misleading statements that Defendants made are material.  False claims about how investor funds were being used – and omissions about the massive diversion of funds – are critically important to a reasonable investor.  *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988) (citing *TSC Indus., Inc. v. Northway*, 426 U.S. 438, 449 (1976)).  Further, reasonable investors would have considered it important to know the truth about the baselessness of Chavez's and CryptoFX's claims of success and their experience in the industry.  Knowledge of the actual facts would have allowed investors to better evaluate CryptoFX's offerings.

The evidence shows that Defendants engaged in this conduct with scienter.  Benvenuto and Chavez, and through him, CryptoFX, knew the truth—or were at least severely reckless in not knowing the truth—about: (1) the actual use of investor funds, (2) the prior results of CryptoFX trading, (3) the massive Ponzi scheme they were conducting, and (4) their own lack of experience

13

and training in the industry.  Chavez and CryptoFX obtained money from the securities' sales in which these untrue and misleading statements were made, in violation of Section 17(a)(2). Because Chavez had ultimate authority over the untrue and misleading statements to investors, he violated Rule 10b-5(b).  His scienter may be imputed to CryptoFX, which therefore is also liable for the violations.  *See, e.g., SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1096-97 n.16-18 (2d Cir. 1972).  Because Chavez was acting on behalf of CryptoFX in making the statements, the company may likewise be held liable for violating Section 17(a)(2) under the theory of *respondeat superior*.  See *Paul F. Newton & Co. v. Tex. Comm. Bank*, 630 F.2d 1111, 1115-19 (5th Cir. 1980) (recognizing doctrine of *respondeat superior* as a basis for an entity's vicarious liability under the securities laws).  Likewise, because Benvenuto personally solicited a $100,000 investment in CryptoFX without disclosing that he was immediately diverting the funds to unrelated use by the CBT Group, he violated Rule 10b-5(b).

> c.  *Violations of Sections 17(a)(1) and (3) and Rules 10b-5(a) and (c)*

Defendants also violated Sections 17(a)(1) and (3) of the Securities Act and Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c) thereunder by engaging in a fraudulent scheme, and in acts, practices, or a course of business that has operated as a fraud.  Proof of scienter is required for Rules 10b-5(a) and (c) and Section 17(a)(1), but at least negligence is sufficient for Section 17(a)(3).  *Aaron v. SEC*, 446 U.S. 680, 691 & 697 (1980).  The scienter of an officer acting on a company's behalf may be imputed to the company.  *See, e.g., Manor Nursing Centers, Inc.*, 458 F.2d at 1096-97 nn.16-18.  These provisions are "expansive" and "capture a wide range of conduct."  *Lorenzo v. SEC*, 139 S. Ct. 1094, 1101 (2019).  In *Lorenzo*, the Supreme Court held that knowingly disseminating a false statement to investors with the intent to deceive can violate Rules 10b-5(a) and (c) and Section 17(a)(1), even if the defendant is not a "maker" of the statement

14

for purposes of Rule 10b-5(b), as that term was defined in *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 142 (2011).

Defendants' fraudulent course of conduct includes the making of material misrepresentations set forth above,[5] which, in addition to violating Section 17(a)(2) and Rule 10b-5(b), also constitute violations of Section 17(a)(1) and (3) and Rule 10b-5(a) and (c). *See Lorenzo*, 139 S. Ct. at 1101-02 (knowing dissemination of misrepresentations with an intent to deceive violates Rule 10b-5(a) and (c) and Section 17(a)(1)); *SEC v. Carter*, No. 4:19-CV-100-SDJ, 2020 WL 6304889, at *5 (E.D. Tex. Oct. 28, 2020) (noting this reasoning applies to Section 17(a)(3) as well); *SEC v. Sullivan*, 68 F. Supp. 3d 1367, 1379 (D. Colo. 2014) (finding that generating false account statements provided to investors violated Section 17(a)(1) and (3) and Rule 10b-5(a) and (c)). Additionally, Defendants' repeated use of investor funds to make Ponzi payments to investors qualifies as deceptive conduct under the federal securities laws. As described above, this misconduct was material and undertaken with scienter.

### d.   *Benvenuto Aided and Abetted Chavez's and CryptoFX's Violations*

In the alternative, Benvenuto aided and abetted Chavez and CryptoFX's primary fraud violations. Under Section 15(a) of the Securities Act and Section 20(e) of the Exchange Act, "any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of [the antifraud provisions of the securities laws], shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided." To establish liability for aiding and abetting, the Commission must show: (1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) that the aider and abettor was at least reckless with regard to the commission of the primary violation; and

---

[5] See the following subsection I(B)(*d*) for a discussion of Benvenuto's state of mind, specifically.

(3) substantial assistance by the aider and abettor in the achievement of the primary violation. *See, e.g., SEC v. Jackson*, 908 F. Supp. 2d 834, 863-64 (S.D. Tex. 2012), citing *SEC v. Treadway*, 430 F. Supp. 2d 293, 336 (S.D.N.Y. 2006).

As demonstrated above, Benvenuto knew, or was at least reckless in not knowing, of Chavez's and CryptoFX's primary fraud violations, and substantially assisted those violations. Having been a CryptoFX investor himself, and having solicited investment in CryptoFX, Benvenuto knew that investors expected their funds to be used in crypto asset trades. Nevertheless, Benvenuto continuously requested that CryptoFX investor money be "funneled" to the CBT Group accounts, instructed Chavez on what to tell investors so their checks could be deposited at CBT, and then deposited individual CryptoFX investor checks into the CBT Group account that he controlled. Benvenuto also made Ponzi payments to CryptoFX investors from CBT Group accounts. In addition, Benvenuto recruited at least one investor to make a $100,000 "cryptocurrency investment" and deposited that check into the CBT Group account. Benvenuto then spent approximately $4.8 million of investor funds on real estate development through CBT Group.

2. Defendants Are Violating the Securities
Registration Provisions of the Federal Securities Laws

Defendants have violated and continue to violate Sections 5(a) and 5(c) of the Securities Act by offering and selling securities to investors without registering those securities offerings with the Commission. *See* 15 U.S.C. §77e(a) and (c). Section 5 prohibits the unregistered offer or sale of securities in interstate commerce unless an exemption from registration applies. *SEC v. Continental Tobacco Co. of S.C.*, 463 F.2d 137, 155 (5th Cir. 1972). Because Section 5 is a strict liability statute, a defendant's intent is irrelevant. *Swenson v. Engelstad,* 626 F.2d 421, 424 (5th Cir. 1980). To establish a *prima facie* case of a violation of Sections 5(a) and 5(c), the Commission

need only prove that:  (i) defendants, directly or indirectly, offered or sold securities; (ii) no registration statement was in effect or filed for the offer or sale of those securities; and (iii) interstate transportation or communication, or the mails, were used in connection with the offer or sale.  *See* 15 U.S.C. §§ 77e(a) & 77e(c); *Cont'l Tobacco,* 463 F.2d at 155.  Once a *prima facie* case is established, the burden shifts to defendants to prove that the securities offerings fall within an exemption to Section 5.  *Cont'l Tobacco,* 463 F.2d at 156.

The evidence establishes that Defendants offered and sold these securities in interstate commerce with no registration statement in effect.  All offers and sales of CryptoFX's securities were unregistered.  (Harris Decl., ¶ 4, APP. 002).  Accordingly, the Commission satisfies this element of a Section 5 claim.  Additionally, Defendants used the internet, including CryptoFX's website and social media, among other means, to find and communicate with potential investors.  Defendants obtained funds from investors via wire transfers.  Defendants' investors are located in multiple states.  Thus, Defendants offered and sold securities through interstate commerce.  *See SEC v. Straub*, 921 F.Supp.2d 244, 262 (S.D.N.Y. 2013) ("[I]t is undisputed that the use of the internet is an 'instrumentality of interstate commerce"); *SEC v. One or More Unknown Traders in Common Stock of Certain Issuers*, No. 08CV1402 (KAM) JMA, 2009 WL 3233110, at *4 (E.D.N.Y. Oct. 2, 2009) (holding that wire transfers were instrumentalities of interstate commerce).

### 3.      Chavez Violated Sections 206(1) and 206(2) of the Advisers Act.

Sections 206(1) and 206(2) of the Advisers Act make it unlawful for an investment adviser to employ any device, scheme, or artifice to defraud, or to engage in any transaction, practice, or course of business that operates as a fraud or deceit upon any client or prospective client.  Sections 206(1) and 206(2) impose a statutory fiduciary duty upon an investment adviser with respect to its clients.  *See SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191-92 (1963).  These

17

duties include the duty to act for the benefit of clients, the duty to exercise the utmost good faith in dealing with clients, the duty to disclose all material facts, and the duty to employ reasonable care to avoid misleading clients. *See id.* at 194. A violation of Section 206(1) requires proof of scienter, and a finding of severe recklessness satisfies this requirement. *See SEC v. Steadman,* 967 F.2d 636, 641-42 (D.C. Cir. 1992); *Broad v. Rockwell Int'l Corp.,* 642 F.2d 929, 961 (5th Cir. 1981) (Scienter may be established by proof of severe recklessness). A violation of Section 206(2) does not require a showing of scienter. *Steadman,* 967 F.2d at 647; *Capital Gains,* 375 U.S. at 195.

Section 202(a)(11) of the Advisers Act defines an "investment adviser" as "any person who, for compensation, engages in the business of advising others . . . as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." Chavez is an investment adviser, because he acts as CryptoFX's portfolio manager. Chavez has sole authority for trading CryptoFX's pooled assets, and is responsible for making its investments. *See e.g., United States v. Ogale,* 378 Fed. App'x 959, 960 (11th Cir. 2010) ("The exercise of control over what purchases and sales are made with investors' funds is considered to be investment advice for purposes of the [Advisers Act.]"). Chavez traded investor funds in numerous crypto assets, determining what trades to make with investors' funds.

Chavez's conduct satisfies the compensation element of Section 202(a)(11) because he received compensation for his services as an investment adviser (*i.e.,* the misappropriated CryptoFX investor funds). *See United States v. Miller,* 833 F.3d 274, 282 (3d Cir. 2016) (finding that adviser compensation includes "any economic benefit" and holding that defendant who sold his firm's promissory notes to his clients met the compensation element of Section 202(a)(11) because the money clients provided "became [the defendant's] compensation—his "economic

18

benefit"—when he commingled investors' accounts and spent the money for his own purposes."); *Ogale*, 378 Fed. Appx. at 960-61 (finding that ill-gotten gains qualify as compensation under the Advisers Act); *United States v. Elliott*, 62 F.3d 1304, 1311 (11th Cir. 1996) (finding that adviser compensation includes "any economic benefit" including compensation from an economic relationship that involved providing investment advice as a primary aspect of the relationship).

Acting as an investment adviser, Chavez violated Sections 206(1) and 206(2) of the Advisers Act when he knowingly misappropriated CryptoFX's assets by using them to pay personal expenses and to fund an unrelated business as detailed above.

Chavez also established separate, individual adviser relationships based on his "mentorship" of the Founders Circle clients. Chavez told the Founders Circle clients that he would provide them with personalized advice and a specialized trading strategy, and then provided them with purportedly individualized trade recommendations to be implemented in their personal crypto asset wallets. *See, e.g., United States v. Lay*, 612 F.3d 440, 446-47 (6th Cir. 2010) (noting that Goldstein "did not hold that a hedge fund investor could never be a client of a hedge fund adviser"); *SEC v. Sentinel Mgmt. Grp., Inc.*, 2012 WL 1079961, at *13 (N.D. Ill. March 30, 2012) (finding adviser owed fiduciary duty to investors where the relationship "contain[ed] several indicia of an adviser-investor relationship that [were] absent from the traditional hedge fund structure"). Chavez also violated his fiduciary duties when he misrepresented: (1) that he would provide these clients with personalized advice and trading strategies, when in fact their assets were invested in the same manner as the assets of all other investors; (2) that their investments were generating higher returns, when such higher payments were simply Ponzi payments that Chavez and CryptoFX deposited into the clients' digital wallets; and (3) his background as an experienced trader with expertise in crypto assets.

19

**C.      The Defendants Are Reasonably Likely to Continue their Illegal Conduct**

Having made a substantial showing that it is likely to succeed on the merits of its claims, the Commission is also required to demonstrate that Defendants are likely to continue their illegal conduct.  In the Fifth Circuit, the Commission makes this showing when "the inferences flowing from the defendant's prior illegal conduct, viewed in light of present circumstances, betoken a reasonable likelihood of future transgressions." *SEC v. Zale Corp.*, 650 F.2d 718, 720 (5th Cir. 1981).  To determine whether there is a "reasonable likelihood" of future violations, courts consider the "sum of the circumstances surrounding the defendant and his past conduct," including (i) the nature of the past violation, (ii) the defendant's present attitude, and (iii) objective constraints on (or opportunities for) future violations of the securities laws. *Id.*  In this context, courts also consider the egregiousness of the defendant's actions, the isolated or recurrent nature of the infraction, the degree of scienter involved, the sincerity of the defendant's recognition of the wrongful nature of their conduct, and the likelihood that the defendant's occupation will present opportunities for future violations. *Id.* (quoting *Blatt*, 583 F.2d at 1334 n.29).

Here, the evidence, when considered in light of the factors set forth above, points to a virtual certainty that Defendants will continue their illegal conduct unless enjoined.  Defendants have conducted for multiple years, and continue to operate, a scheme through which they have obtained millions of dollars in investors' funds using false and misleading statements and deceptive acts and practices.  Chavez's present attitude provides no assurance that he will refrain from future violations.  For example, he claimed during testimony that CryptoFX's trading proceeds justified the claim that investors could earn 90% return every six months. (Chavez Test. 91:18-92:12, APP. 033.1).  Chavez made this bold claim knowing that the only way CryptoFX had managed to pay *any* returns had been through extensive use of Ponzi payments. (Hahn Decl., ¶¶

17-19, APP. 222-223).  Because Defendants' Ponzi payments are the only thing giving them the veneer of success, it is highly likely that, unless immediately enjoined, they will continue to lure more investors into this scheme.

## II.     The Court Should Grant Additional *Ex Parte* Relief

In addition to a restraining order (and a preliminary injunction), the Commission also seeks an asset freeze, the appointment of a receiver, and orders requiring an accounting, prohibiting the destruction of documents, allowing expedited discovery, and permitting alternative service. Federal courts have broad equitable powers enabling them to fashion appropriate ancillary remedies necessary to grant relief. *See Manor Nursing Centers*, 458 F.2d at 1103-04; *Blatt*, 583 F.2d at 1335-36.  "[O]nce the equity jurisdiction of the district court properly has been invoked, the court has power to order all equitable relief necessary under the circumstances." *SEC v. Materia*, 745 F.2d 197, 200 (2d Cir. 1984).

### A.     It Is Appropriate to Grant the Requested Relief on an *Ex Parte* Basis

Rule 65(b) of the Federal Rules of Civil Procedure authorizes courts to issue a temporary restraining order without notice to the adverse party if "specific facts in an affidavit for verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." FED. R. CIV. P. 65(b).

Here, the evidence demonstrates that immediate and irreparable injury will result to the Commission and investors before Defendants can be heard.  The evidence establishes that Defendants' scheme is ongoing, that Defendants' only path forward is to continue to raise money from investors to pay purported profits/returns to investors, and that Defendants will further encumber investor-related assets and dissipate the investor funds received from the offering.

21

Further, the Rule 65 certification being submitted with this Motion sets forth experience in more than 100 cases since 1998 in which the Fort Worth Regional Office of the Commission has sought and obtained emergency and/or *ex parte* relief for the protection of defrauded investors, which is an additional basis for the Commission's belief that irreparable injury and loss will occur if the Court requires notice and a hearing.

> **B.**   **An Asset Freeze Is Necessary**

An asset freeze may be granted "even in circumstances where the elements required to support a traditional SEC injunction have not been established." *SEC v. Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990). The Commission need not show a reasonable likelihood of future violations, because an asset freeze only preserves the status quo. *See CFTC v. Muller*, 570 F.2d 1296, 1300 (5th Cir. 1978); *Unifund SAL*, 910 F.2d at 1039. When there is evidence that a defendant might dissipate assets, a court need only find "some basis" to infer a violation of the securities laws to impose a freeze order and grant other ancillary relief. *See Unifund SAL*, 910 F.2d at 1041; *SEC v. Reynolds*, No. 3:08-CV-0438-B, 2008 WL 4561560, at *2 (N.D. Tex. Oct. 9, 2008); *SEC v. AmeriFirst Funding*, No. 3:07-CV-1188-D, 2007 WL 2192632, *3 (N.D. Tex. July 31, 2007).

The Commission's evidence of Defendants' past and ongoing illegal conduct justifies an asset freeze here. The evidence establishes that Defendants have engaged in egregious violations of the federal securities laws by raising millions of dollars misrepresenting the nature and outcome of their investments, and will engage in future violations unless enjoined. An asset freeze is therefore necessary to maintain the status quo by preventing further dissipation of investor funds and to facilitate the satisfaction of whatever equitable relief the Court may ultimately order, as

well as preventing further encumbrance of investors' assets.[6] *See, e.g., Manor Nursing Ctrs.*, 458

F.2d at 1106; *Muller*, 570 F.2d at 1300; *AmeriFirst Funding*, 2007 WL 2192632, at *3.

### C.    Appointment of Receiver

The appointment of a receiver is a well-established equitable remedy in civil enforcement

proceedings for injunctive relief. *See, e.g., SEC v. First Fin. Group of Texas*, 645 F.2d 429, 438

(5th Cir. 1981). Courts have wide discretion to order equitable relief in Commission actions. *In*

*re San Vicente Med. Partners Ltd.*, 962 F.2d 1402, 1406 (9th Cir. 1992). Courts will appoint a

receiver where necessary to: (1) to preserve the *status quo* while various transactions are being

unraveled in order to determine an accurate picture of the fraudulent conduct, *SEC v. Manor*

*Nursing Ctrs., Inc.*, 458 F.2d 1082, 1105 (2nd Cir. 1972); (2) to protect "those who have already

been injured by a violator's actions from further despoliation of their property or rights," *Esbitt v.*

*Dutch-American Mercantile Corp.*, 335 F.2d 131, 143 (2d Cir. 1964); (3) to prevent the dissipation

of the defendant's assets pending further action by the court, *SEC v. Am. Bd. of Trade, Inc.*, 830

F.2d 431,436 (2d Cir. 1987); (4) to install a responsible officer of the court who could bring the

companies into compliance with the law, *Id.* at 437; or (5) to place hopelessly insolvent entities in

bankruptcy to effect their liquidation, *Id.* at 436.

"The Court may appoint a receiver on a prima facie showing of fraud and

mismanagement." *SEC v. Current Fin. Servs., Inc.*, 783 F. Supp. 1441, 1443 (D.D.C. 1992). As

discussed above, the Commission has made a strong *prima facie* showing of fraud. The

Defendants raised millions of dollars to conduct crypto asset and foreign exchange trading, and

then they used less than 10% of the investor funds to that purpose. Rather, Defendants spent wildly

on real estate and personal expenses, lulling investors – and even gaining more – through the use

---

[6] In its Complaint, the Commission seeks injunctive relief, disgorgement, prejudgment interest thereon, and civil penalties.

of Ponzi payments. The appointment of a receiver will assist in preserving assets by preventing the Defendants who illegally obtained investor funds from disposing of, wasting, or further encumbering assets that would otherwise be available to satisfy a judgment against them, potentially for the benefit of the investors. Thus, a receiver is warranted.

The Commission staff has vetted receiver candidates to provide a recommendation to the Court, and has identified a candidate who possesses superior skill and experience in this area, agrees to the standard billing and reporting requirements, agrees to reduce professional fees, is located in the Houston area, where Defendants' and Relief Defendants' principal real assets are located, and has cleared conflicts. The Commission's proposed candidate is John Lewis of Shook Hardy & Bacon.

**D.      Other Necessary Ancillary Emergency Relief**

1.      Sworn Accounting

An order requiring Defendants to prepare sworn accountings is appropriate here because it will enable the Commission and a receiver to accurately determine the scope of the fraud and disposition of investor funds, as well as to identify all available assets to help ensure that funds and assets are frozen properly and preserved to satisfy any future order of disgorgement or civil penalties against Defendants. *See Manor Nursing Ctrs.*, 458 F.2d at 1105; *SEC v. Oxford Capital Secs., Inc.*, 794 F. Supp. 104, 105-06 (S.D.N.Y. 1992). *See SEC v. International Swiss Invs. Corp.*, 895 F.2d 1272, 1276 (9th Cir. 1990); *Manor Nursing Ctrs.*, 458 F.2d at 1105-06.

2.      Document Preservation

An order prohibiting the movement, alteration, destruction, concealment, or disposing of books, records, accounts, electronic storage devices, and computers is necessary to protect records for discovery. Such orders are routinely granted to protect the integrity of the litigation. *See, e.g.*,

*Unifund SAL*, 910 F.2d at 1040, n.11.  Specifically, in this case, it is critically important that Defendants preserve access to any storage devices that might contain the private key(s) to access digital wallets.

    3. <u>Expedited Discovery</u>

  An order providing for expedited discovery will allow the Commission to act quickly to obtain records necessary to identify and preserve assets for the benefit of investors, to depose Defendants, their employees, and others on short notice, and to seek other discovery on an expedited basis from Defendants and third parties prior to a hearing on the Commission's application for a preliminary injunction.

    4. <u>Alternative Service</u>

  Alternate service on Defendants and financial institutions by email and facsimile is appropriate here because the effectiveness of other relief the Commission seeks could be diminished by any delay in awaiting the formal service of process.

## CONCLUSION

Based on the foregoing, the Commission respectfully requests that the Court enter orders

providing for the relief requested and such other and further relief as the Court may deem just and

proper.

Dated:  September 19, 2022                    Respectfully submitted,

UNITED STATES SECURITIES AND
EXCHANGE COMMISSION

Matthew J. Gulde
Illinois Bar No. 6272325
United States Securities and
Exchange Commission
Burnett Plaza, Suite 1900
801 Cherry Street, Unit 18
Fort Worth, TX  76102
Telephone:  (817) 978-1410
Facsimile:  (817) 978-4927
guldem@sec.gov

*Attorney for Plaintiff*