IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| *Plaintiff,* | § § | |
| vs. | § § | |
| MAURICIO CHAVEZ, GIORGIO BENVENUTO and CryptoFX, LLC, | § § § | CIVIL ACTION NO. 4:22-CV-03359 |
| | § | JUDGE ANDREW S. HANEN |
| *Defendants.* | § § | |
| CBT Group, LLC, | § § | |
| *Relief Defendant.* | § § | |

## RECEIVER'S FIRST INTERIM REPORT

John Lewis, Jr. ("Receiver"), the court-appointed Receiver for Mauricio Chavez ("Chavez"), Giorgio Benvenuto ("Benvenuto"), CryptoFX, LLC ("CFX") and CBT Group, LLC ("CBT"), pursuant to the Order Appointing Receiver ("Receivership Order") (Doc. No. 11) files his First Interim Report ("FIR"), showing the Court as follows:

### EXECUTIVE SUMMARY

In the sixty (60) days since his appointment, the Receiver and his team's investigation has uncovered the following:

1.  The breadth, geographic scope, and financial impact of the apparent financial fraud in this case is significantly larger and more extensive than could be known by the Securities and Exchange Commission ("SEC") at the time that the SEC brought this action. Rather than a fraud in the $12 million range as previously thought, the Receiver has uncovered, through an as of yet incomplete forensic review, credible evidence that conservatively estimates that approximately

RECEIVER'S FIRST INTERIM REPORT

40,000 individuals invested over $150 million.  For example, Defendant CFX's business records show that the monthly "revenue" for at least two months in 2022 exceeded $10 million per month.  *See* CFX business record, "Volumen De Julio 2022" reflecting monthly payments to CFX for the month of July 2022 in the $20 million range, attached herein as **Exhibit A**; *see also* Analysis of Actual and Estimated Total Revenue 1/2021 - 9/2022, attached as **Exhibit B.**  The analysis in Exhibit B uses actual CFX reports for 9 months, which total $111 million in revenue.  In addition, the missing 12 months are estimated based on adjacent months and calculated as $113 million.  The total actual and estimated revenue is $224 million.  While the Receiver believes these estimates are reasonable, for purposes of this initial report, the Receiver had reduced the total estimated investment to $150 million.

2. Based on a preliminary review of CFX's business records as well as public records, the Receiver is confident that CFX, Chavez, and related entities controlled by or affiliated with Defendants, have continued, notwithstanding this Court's Receivership Order enjoining them from doing so, to conduct "business," including soliciting and accepting "investor" money in the form of cash.  Further, according to various sources, Defendants continue to make "payments" in cryptocurrency giving the appearance of ongoing, legitimate business.  Since entry of this Court's Receivership Order, the Receiver has become aware (and has independently confirmed) ongoing operations in Texas (new locations), California, New Jersey, Louisiana, and Illinois.  In Receiver's view, there appears to be no meaningful lawful or legitimate business conducted by Defendants herein, either before this action commenced or during the pendency of this Receivership.  Defendants' activities and operations bear the indicia of a Ponzi scheme, whereby "investors"/victims, many of whom are fearful of coming forward due to concerns regarding their immigration status, were lured to invest in crypto currency and to participate in crypto

"academies." Many have reported promises of outsized investment returns and incentives for recruiting other "investors." This apparent fraud continues unabated. The Receiver and his team have quickly identified and deployed resources across the country, interviewed victims willing to do so, and continued to search business records, public records, social media, and issue third-party subpoenas requesting information and documents.

3. Given the dynamics described above, the Receiver's work in this case will require ongoing recovery of, managing, accessing, and reviewing a significant volume of data from electronic and paper business records recovered from Defendants' businesses, forensic tracing of millions of dollars in cash transactions, tranches of text messages, WhatsApp group messages and threads, PayPal and other electronic payment methods, third-party records from depository institutions, and professionals with client records comprising Receivership assets. Paper and electronic business records alone recovered thus far approximate 177,099 pages of scanned paper documents and seven terabytes of electronic data.

4. Early indications are that this case is likely to result in a substantial recovery, but the list of victims, and amounts invested continues to grow. As is indicated later in this Report, the Receiver has recovered approximately $3.7 million, which is currently on deposit in fiduciary accounts established by the Receiver for this case. Further, the Receiver and his team have identified and are actively liquidating an additional $6-8 million in Receivership assets and identifying assets held by third parties. While the investigation of claims against third parties is in its early stages, recovered business records indicating transfers of large amounts of money to CFX senior employees, family members of the Defendants, related business entities, and other third parties, support the strong likelihood that the Receivership Estate will have substantial causes of action of significant amount against these third parties.

**I.     INTRODUCTION**

5.      This civil action filed by the SEC against Chavez, Benvenuto, CFX, and CBT (together "Receivership Defendants") involves allegations of a multi-million dollar securities fraud directed at Latino investors. ("Complaint," Doc. No. 3). The Complaint estimates that Chavez raised more than $12 million and defrauded as many as 5,000 investors by soliciting to trade their funds on crypto asset platforms through continued misrepresentations. *Id.*

6.      The individual Defendants, Chavez and Benvenuto, are both Harris County, Texas residents. The two Defendant entities are CFX and Relief Defendant CBT. CFX is a Texas Limited Liability Company formed by Chavez in 2020 to develop and conduct his crypto currency trading business. CBT is also Texas Limited Liability Company formed in 2020 by Chavez, Benvenuto, and Gabriel Torres ("Torres"). Torres is not currently a party is this case in his personal capacity. CBT appears to be a real estate development company formed for the purpose of using funds generated by Chavez in the CFX business for real estate acquisition and development.

7.      On September 29, 2022, upon the SEC's motion, this Court entered its Receivership Order for all four Defendants—Chavez and Benvenuto, individually, and the two corporate Defendants ("Receivership Estate") (Doc. No. 11). In the Receivership Order, among other things, the Court took exclusive jurisdiction and possession of all of the assets of the Receivership Estate of whatever kind and wherever situated. *Id.* at ¶ 1.

8.      The Receivership Order mandates that "all Receivership Assets are frozen" and "all persons and entities with direct or indirect control over any Receivership Assets, other than the Receiver, are hereby restrained and enjoined from directly or indirectly transferring, setting off,

receiving, changing, selling pledging, assigning, liquidating, or otherwise disposing of or withdrawing such assets." *Id*. at ¶ 3.

9.    The Receivership Order further directed all Defendants and Relief Defendant and all their past and/or present employees, contractors, agents, attorneys, and accountants, to preserve and turn over to the Receiver forthwith all Receivership property, as well as all information and documents, whether in paper or electronic form. *Id*. at ¶¶ 8, 17-18.

10.   Additionally, the Receivership Defendants are required to affirmatively assist the Receiver in fulfilling his duties and obligations and "must respond promptly and truthfully to all requests for information and documents from the Receiver." *Id*. at ¶ 13.

11.   Among other things, the Receivership Order authorizes and directs the Receiver to:

   i. take custody, control, and possession of all records, assets, and other property of the Receivership Estate;

   ii. conduct the business operations of Defendants, including the continuation or termination of employment arrangements and all other aspects of any active business operation;

   iii. administer the assets of the Receivership Estate, including the authority to liquidate assets;

   iv. perform an accounting of the receipt, disposition, and use of the subject investment proceeds; and

   v. investigate any matters that the Receiver deems appropriate in connection with the Receivership Estate.

*Id*. at ¶¶ 14 – 20, 36 – 38, 40 - 41.

12.   The Receivership Order directs the Receiver "to file with the Court and serve upon the parties within 60 days of his appointment (November 28, 2022), a preliminary report setting out the identity, location, and value of the known assets of the Receivership, and any liabilities pertaining thereto." *Id*. at ¶ 51. This Report is submitted in compliance with the Receivership

Order to inform the Court of the status of the Receiver's investigation and activities in this matter since the Receiver's appointment on September 29, 2022. The Receiver will provide further quarterly reports as provided for in the Receivership Order. *Id*. at 52.

13. This First Interim Report (FIR) is based upon the preliminary investigation conducted by the Receiver and his team focused urgently on: (a) identifying and securing Receivership assets wherever located; (b) securing and conducting cooperating witness interviews, including a voluntary interview with one of the individual Defendants (Benvenuto); (c) the preparing of paper and electronic records for a detailed forensic analysis; (d) review of CFX and CBT business records obtained from investors or third-parties; and (e) conducting public records searches and related due diligence to identify affiliated parties, entities, and other potential relief defendants. As the work of the Receiver and his team are in very early stages, this FIR includes some good faith estimates as to scope and volume of records, value of unliquidated Receivership assets and only preliminary assessments as to disputed, unliquidated and contingent claims belonging to the estate.

14. This FIR includes (a) a general summary of the work done to-date by the Receiver and his team; (b) a statement as to the Receiver's preliminary conclusions about the extent and nature of the Receivership Estate's assets and liabilities; and (c) the Receiver's proposed plan for administering the Receivership going forward.

## II. SUMMARY OF RECEIVERSHIP OPERATIONS

15. On September 29, 2022 ("First Day"), immediately following the hearing resulting in the Receiver's appointment, the Receiver, SEC attorneys and professional staff, with the

assistance of U.S. Marshall Service, arrived at the corporate offices of CFX at 1124 Blalock, Rd., Houston, Texas ("Blalock"). At Blalock, on the First Day, the Receiver:

    a. Took custody, possession, and control of the CFX leased business premises and all the contents therein;

    b. Changed the Blalock exterior door locks;

    c. Posted signage that CFX was closed pursuant to Court Order and directed victims and other third parties to contact the Receiver;

    d. Took custody of computers, i-pads, a phone, other electronic devices, the office's security system, and two safes protected by codes and/or access keys;

    e. Took possession of all furniture and other items found at Blalock;

    f. Secured CFX and CBT business records onsite;

    g. Took possession of $53,345.56 in cash found in small denominations in various locations in Blalock;

    h. Interviewed Chavez and Benvenuto and their attorneys (John Sklar and Dan Cogdell);

    i. Performed initial inventory and inspection of the documents and items;

    j. Personally inspected images from CFX's security surveillance system to identify CFX computers that were removed from Blalock before the Receiver's appointment; and

    k. Personally interacted with potential victims who arrived at Blalock intermittently to collect promised payments owed to them by CFX.

16. The following day, September 30, 2022, and over the course of the following days, the Receiver and his team returned to Blalock and accomplished the following:

    a. Complete sweep of the CFX premises consisting of two floors and approximately 26 offices, work spaces and meeting rooms, carefully packing all paper records, notes and computers and arranging to move the same to a secure location for scanning and review over a three day period;

    b. Established contact with Blalock landlord;

    c. Encountered and interacted with more potential victims who arrived at Blalock to collect promised payments owed to them by CFX.

    d. Established contact with Coinbase, Blockchain and depository institutions regarding Defendants' accounts frozen by the S.E.C. to advise of the Receiver's appointment and began the process of collecting relevant records and sweeping those accounts;

    e. Submitted IRS Form 56 advising of Receiver's interest;

    f. Coordinated with the Post Master to forward all mail for the Defendants to the Receiver's address;

    g. Opened trust accounts under the name of each Receivership Defendant;

    h. Prepared notices of *lis pendens* and appointment of the Receiver and recorded the same in the relevant property records.

17. More specifically, the Receiver's team collected 32 devices and 55 boxes of paper documents from Blalock, noting the specific office locations within the Blalock premises where business records and devices were found. These devices and documents were sent to Gulfstream's (image and data company) secure facility, where the documents would be scanned and information would be forensically collected from the devices. Eight devices are either encrypted or protected by username and password, and the data on these devices is not accessible without the user credentials. Despite repeated requests, Chavez has refused to provide (or provide the names of those who may be able to provide) the credentials for these devices. The remainder of the devices have had the data from the user folders extracted, processed (including deduplication) and loaded to the Relativity database. The paper documents have all been scanned. The scanning process resulted in 177,099 pages of scanned paper, all which have been loaded into the Relativity database. For a more detailed description of the devices collected from Blalock and corresponding image size and file count, *see* **Exhibit C**.

18. Pursuant to the Receivership Order, the Receiver employed the following professionals:

    a. Shook, Hardy & Bacon LLP ("Shook") as his legal counsel;

    b. Hays Financial Consulting, LLC, of Atlanta, Georgia ("HFC"), to serve as accountants, forensic examiners, and financial consultants to the Receiver; and

    c. Pugh & Accardo PC as his legal counsel in the State of Louisiana.

As a result, the Receiver has had a team of professionals, including attorneys and forensic accountants, working with him in the administration of the Receivership and in conducting this investigation.

19. Also pursuant to the Receivership Order, the Receiver employed the following third-parties to assist with the performance of his duties, including:

    a. Mark Dimas of Dimas Property to assist with the sale of multiple parcels real estate receivership assets;

    b. KCC to build and maintain the Receiver's website;

    c. Translation and Interpretation Network to assist with translation of key documents and information from English to Spanish for the benefit of Spanish-speaking victims; and

    d. Gulfstream Legal Group to assist with the imaging of the computers and other devices and scanning of paper documents.

20. Within a few days of the Receiver's appointment, the Receiver and his team established an information website (http://cryptofxreceiver.com/) for all "investors"/victims, any creditors, and others with regard to the status of the Receivership and to provide for on-going communications, updated pleadings filed in the proceeding, and an e-mail address and phone number for questions and inquiries. The information is provided in both English and Spanish. In addition, the website provides answers to frequently asked questions and access to the complete

court docket with no PACER charges.  The Receiver and his team are also working with KCC to optimize the website with key words for easier Google search by "investors" and others.

21.     The Receiver also established an email and phone number, both of which are posted on the Receiver's website, for "investors"/victims to contact the Receiver and his team.  As of the filing of this FIR, the Receiver's team has collected information and/or documents from 218 victims.

22.     In addition, the Receiver's team has conducted interviews with several cooperating "investors," and others are scheduled to take place in December 2022.  The SEC estimated the number of victims in this case to be 5,000.  The Receiver has not identified a list of all "investors"; however, reports from victims and a review of CFX's sequentially numbered "contracts" signed by "investors" indicate the number may be as high as 40,000.  The highest contract number we have seen in the records so far is 56,030; however, there were rollover accounts, which we estimate at 30%, as indicated in Exhibit B.  The Receiver and his team continue to search for a list of all investors.  *See* Copies of Venture Agreements CryptoFX, LLC Nos. 056030-34 signed on September 28, 2022, more than a week after this case was filed and the day before the Court appointed the Receiver, is attached as **Exhibit D**.

23.     Further, with the entry of the Temporary Restraining Order ("TRO"), this Court froze the Defendants' assets and monies subject to their direct and/or indirect control.  The SEC served the TRO on various financial institutions.  Following the Receiver's appointment, the Receiver and his team served notice of his appointment and the continuation of the asset freeze upon additional banks, crypto currency platforms, financial institutions, and other entities.  A list of the 25 entities upon which Freeze Letters have been served by the SEC and the Receiver is attached as **Exhibit E**.

24. The Receiver has also issued third-party subpoenas for the collection of documents and information to financial institutions, crypto currency platforms, professionals retained by the Defendants, and other fact witnesses. A list of the third-party subpoenas issued in this case by the Receiver is attached as **Exhibit F**.

25. With regard to real estate Receivership assets, the Receiver has listed two of these properties located in Waller County, TX, for sale and a third one is expected to be listed soon.

26. The Receiver has recorded *lis pendens* notices in five other real estate properties located in Fort Bend County, TX. Records show these properties, while not directly owned by the Defendants, were purchased with Receivership funds.

27. Additional work performed by the Receiver and his team since the appointment of the Receiver includes:

    a. Perform preliminary evaluation of the assets held by the Receivership Estate;

    b. Plan for the preparation of an accounting of the sources and uses of funds of the Receivership estate;

    c. Serve requests for documents, information and for turnover of Receivership assets to the Defendants;

    d. Request return of the retainers held by Defendants' counsel;

    e. Registration of the Receivership Order in federal districts where Receivership assets are potentially located or where Defendants' fraudulent activities appear to continue, including Northern District of Texas, Western District of Texas, Northern District of California, Eastern District of Louisiana, Central District of Illinois, and District of New Jersey;

    f. Negotiate termination of the lease with the Blalock landlord;

    g. Negotiate termination of third-party services at Blalock and coordinate removal of furniture and other leased property;

    h. Interview Defendant Benvenuto;

      i. Place signs on the door of Defendants' office in Chicago, IL and direct "investors"/victims to the Receiver's website and to contact the Receiver;

      j. Access the code-protected safes at Blalock through the services of a locksmith and obtain the cash and documents found therein.

      k. Coordinate valuation and sale of Receivership personal property, such as television sets, cash-counting machines, computer monitors, and others.

28. As a result of these and other activities, the Receiver and his team believe that they has gained a good understanding of the facts and issues that will be most critical to the effective administration of this Receivership, many of which are set forth in this Report.

### III. CASH ON HAND AND ESTIMATED ACCRUED ADMINISTRATIVE EXPENSES

29. As of the filing of this FIR, the Receivership Estate has $3,737,530 deposited in four trust accounts named for each of the Defendants.

30. Currently, the Receivership has accrued approximately $8,566.98 in administrative expenses. *See* Table describing administrative expenses incurred by the Receivership, attached as **Exhibit G**.

31. The Receiver and the professionals working with him are well aware that the fees and expenses associated with the administration of the Receivership are paid from the assets of the Receivership Estate. The goal of all involved professionals is to conclude this Receivership as quickly and efficiently as can be reasonably accomplished thereby maximizing recovery to victims.

32. Prior to the Receiver's appointment, the Receiver submitted a proposed fee structure, which included significant discounts from the professionals' standard market rates and a $120,000 cap for their professional fees incurred in the first 60 days.

33. As with all receiverships, the earliest phase is labor intensive, requiring significant time and effort from multiple professionals. As of November 28, 2022, the total professional fees

incurred are approximately $245,800. *See* Table describing fees billed by retained professionals, attached as **Exhibit H**. The fees are greater than the cap principally due to (1) lack of cooperation by Defendants; (2) lack of any organized accounting records; (3) on-going fraud; (4) massive fraud with an estimated 40,000 investors, thousands more than estimated by the SEC, with estimated total investments of over $150 million.

34. As provided for in the Receivership Order, the Receiver and the professionals working with him will apply to the Court for approval to pay professional fees and expenses.

### IV. SCHEDULE OF RECEIPTS AND DISBURSEMENTS

35. As of the filing of the FIR, no disbursements to "investors"/victims or creditors have taken place.

### V. DESCRIPTION OF ALL KNOWN RECEIVERSHIP PROPERTY

36. At this preliminary stage, the Receiver estimates a total of $ 10,388,543 in known liquidated and unliquidated Receivership assets. For a more detailed description of currently known Receivership property and corresponding approximate value, *see* attached as **Exhibit I**.

37. It is the Receiver's plan to prudently market and sell the real estate and other assets of the Receivership for the highest prices obtainable. All sales of real estate must be approved by the Court, following a motion to the Court and hearing if necessary.

38. The Receiver and his team's investigation is continuing; however, the investigation shows additional Receivership property held by third parties. The Receiver plans to seek a turnover of all of these assets and also move for the expansion of the Receivership Order to include other persons and/or entities known to hold Receivership assets, as discussed below in Section VIII of the FIR.

39. Depending on the equity in each of the properties, appropriate action will be taken to either sell, hold, donate, or abandon properties in order to maximize the return of cash to the estate. It is too early to tell at this time what price the assets will sell for, the relative costs associated with the sales, or the potential recovery benefit to the Receivership estate.

## VI. DESCRIPTION OF LIQUIDATED AND UNLIQUIDATED CLAIMS

40. This Ponzi scheme was primarily an all-cash scheme, and it is going to require significant resources to unravel the claims of the Receivership estate. A review of the monthly data discussed in Exhibit B indicates that 90% of the investments in available records were in cash.

41. The Receiver will have substantial claims for bonuses and commissions for a large number of third parties and will have to evaluate collectability from these parties. Other claims will have to be researched in the 177,000 pages of scan data and approximately seven terabytes of electronic data.

## VII. LIST OF ALL KNOWN CREDITORS

42. At this preliminary stage, the only known creditor is BZO Custom Wheels, LLC, the landlord of the CFX's offices on Blalock ("Landlord"). Landlord has an unliquidated claim for approximately $20,239.18 against the Receivership estate, which includes rent and utility bills. The Receiver and his team are negotiating the sale of Receivership personal property at Blalock to set off Landlord's claim.

43. The Receiver and his team's investigation is ongoing as to potential claims from victims. This Court retains jurisdiction over all claims against the Receivership Estate. The Receiver will develop a distribution plan for the processing of all claims, which will be submitted to the Court for approval.

44. The Receiver is not aware of other creditors at this stage.

## VIII. RECEIVER'S PROPOSED PLAN FOR ADMINISTERING THE RECEIVERSHIP

45. The Receiver recommends the continuation of the Receivership, which was established only 60 days ago.

46. The Receiver's key focus for the next 90 days will be on the following tasks:

- Review scanned and imaged documents
- Determine other third parties who may possess relevant information and/or documents and serve additional freeze letters and subpoena such records and witness testimony, including from CFX former employee and/or agents
- Trace funds to locate additional assets
- Determine commissions paid and if those will be pursued
- Determine the Net Winners
- Develop electronic claim form for investors
- Establish claims verification process
- Continue working with realtors and appraisers to sell the real properties
- Determine resale value of personal property and the appropriate method of sale in order to maximize the benefit to the Receivership estate
- Continue communications with "investors" and/or their counsel

47. The Receiver intends to file a motion for show cause against Chavez for failure to comply with the Receivership Order, including failure comply with ¶¶ 9 and 10 of the Order, failure to turn over Receivership assets and produce documents and information requested by the Receiver

48. In addition, the Receiver and his counsel will determine whether there are claims against third parties that could result in meaningful recovery to the Receivership Estate.

49. The Receiver also intends to file a motion to expand the Receivership estate to include entities that hold Receivership assets and/or funds.

50. In addition, the Receiver and his team will continue to conduct a factual and legal analysis of issues that could affect whether tracing should be applied to certain investments. Based on the information and documents reviewed to date with estimated 40,000 investors and over $150

million in investments, with 90% of that in cash, and some payments in Bitcoin, it does not appear that complete tracing of investments will be possible and/or practicable.

51. The Receiver and his team have determined that the majority of the funds received from and paid to "investors"/victims were in the form of cash. This determination is based on a review of CFX's paper records as well as data imaged and extracted from the computers located at Blalock. CFX records show that the cash received by CFX was not deposited into a bank account but simply taken in from one set of investors and then paid out to another set of investors. On some days, over $1 million in cash was received and then immediately paid out. *See e.g.* CFX Business Record "Report 03/30/2022," which indicates for this day there was $2,029,000 in revenue and $1,948,087 was paid out as shown in the "Cash Report" section of the Daily Report, attached as **Exhibit J**.

52. In addition to analyzing the sources and uses of cash, the Receiver and his team will be analyzing transactions through the Defendants' cryptocurrency and bank accounts. The Receiver is in possession of transaction reports from Coinbase and Blockchain.com, which appear to be the primary platforms used to invest in cryptocurrencies, as well as the Defendants' bank account records.

53. To date, the Receiver has not located a set of books and records that tracked CFX's cash, banking, investments and investor activity. Instead, the transactions are scattered among various reports, which must be analyzed by the Receiver's team and compiled to complete the Receiver's analysis. If the Receiver is unable to locate a set of books or transaction ledgers, the funds tracing analysis may be a lengthy manual process.

54. Additionally, in blatant violation of these Court's Receivership Order, CFX representatives continue to operate, soliciting investments and promising payments to investors.

The Receiver and his team have identified several other CFX satellite offices operating in Texas, California, Illinois, New Jersey, and Louisiana.  On November 15, 2022, the Receiver sent a cease and desist letter to Chavez, asking that he and persons under his control cease all CFX-related operations.  For a more detailed description of these ongoing activities, *see* **Exhibit K**.  The Receiver and his team will continue to investigate these activities in accordance with the Receivership Order and for the benefit of the Estate.

55. Further, in the following 90 days, the Receiver and his team will begin developing a Liquidation Plan.  The Receiver estimates that a Liquidation Plan will be filed with the Court by March 1, 2023.

56. In administering the Receivership Estate, the Receiver will consider the cost and the likely benefit associated with most activities, although it is important to understand that there are certain activities that must be undertaken regardless of the cost.

57. At this early stage, it is difficult to predict how long it will take for the Receiver to complete his work.  As the Receivership moves forward, the Receiver and his team will continue its efforts to most efficiently recover and realize the value of assets for the benefit of the Receivership Estate.

Respectfully submitted, this 28th day of November, 2022.

Dated:  November 28, 2022

Respectfully submitted,

SHOOK, HARDY & BACON L.L.P.

By: */s/ Sonila Themeli*
    Sonila Themeli
    Texas Bar No. 24073588
    S.D. Tex. Bar No. 2828237
    600 Travis Street, Suite 3400
    Houston, TX 77002
    Telephone:  713.227.8008
    Facsimile:   713.227.9508
    sthemeli@shb.com

    Caroline M. Gieser
    (admitted *pro hac vice)*
    1230 Peachtree Street, NE, Suite 1200
    Atlanta, GA  30309
    Telephone:  470.867.6000
    mcgieser@shb.com

*Counsel for Court-appointed Receiver*

## **CERTIFICATE OF SERVICE**

I hereby certify that on this the 28th day of November, 2022, the above and foregoing document was filed electronically through the CM/ECF system, which sent notification of such filing to all known counsel of record, addressed as follows:

| | |
|---|---|
| Matthew J. Gulde<br>UNITED STATES SECURITIES<br>AND EXCHANGE COMMISSION<br>Burnett Plaza, Suite 1900<br>801 Cherry Street, Unit 18<br>Fort Worth, TX  76102<br>Telephone:   817.978.1410<br>Facsimile:    817.978.4927<br>guldem@sec.gov<br><br>*Attorney for Plaintiff* | Mauricio Chavez, *Pro Se*<br>9423 Autauga Street<br>Houston, TX  77080<br>ceo10explan@gmail.com<br><br>*Defendant Pro Se*<br><br>Dan L. Cogdell<br>Jones, Walker L.L.P.<br>811 Main Street, Suite 2900<br>Houston, TX  77002<br>Telephone:  713.437.1869<br>Facsimile:   713.437.1810<br>dcogdell@joneswalker.com<br><br>*Attorney for Defendant,*<br>*Giorgio Benvenuto* |

*/s/ Sonila Themeli*
Sonila Themeli