**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | § § § | |
| Plaintiff, | § § | |
| | § | CIVIL ACTION No. 4:22-cv-03359 |
| v. | § § | |
| MAURICIO CHAVEZ, GIORGIO BENVENUTO, and CRYPTOFX, LLC, | § § § § | JUDGE ANDREW S. HANEN |
| Defendants, | § § | |
| and | § § | |
| CBT GROUP, LLC, | § § | |
| Relief Defendant. | § § | |

**RESPONSE TO RECEIVER'S MOTION FOR AN ORDER TO
SHOW CAUSE WHY DEFENDANT MAURICIO CHAVEZ
SHOULD NOT BE HELD IN CIVIL CONTEMPT FOR FAILING
TO COMPLY WITH THIS COURT'S ORDER APPOINTING RECEIVER**

# **Table of Contents**

Table of Authorities ............................................................................................................. iii

I.      Statement of Issues to be Ruled upon by the Court and Stage of Proceedings ................. 1

II.     Summary of the Argument ................................................................................................ 1

III.    Factual Background ......................................................................................................... 1

      A.      Mr. Chavez Starts in Crypto .................................................................................. 2

      B.      CryptoFX's Venture Agreements Disclosed Risk. .................................................. 2

      C.      CryptoFX's Classes were no Pretext. ...................................................................... 3

      D.      CryptoFX's Returns were far Below What Crypto was Offering............................ 4

      E.      CryptoFX Grew Beyond its, or Mr. Chavez's, Management Capabilities. ............ 5

      F.      The Candid Texts Belie Any Claim of Fraud. ....................................................... 10

      G.      Mr. Chavez did not try to Hide any Assets............................................................ 10

      H.      Mr. Chavez's Efforts to Comply with the Court's Order. .................................... 11

IV.     The Receiver's Issues ...................................................................................................... 14

      A.      Sworn Statements............................................................................................... 14

      B.      Cars ................................................................................................................... 15

      C.      Mr. Chavez's 2021 Tax Return.......................................................................... 16

      D.      Trust Documents ............................................................................................... 16

      E.      Continuing Operations ...................................................................................... 17

      F.      Passwords and Safe Combinations ..................................................................... 18

      G.      Funds ................................................................................................................. 19

      H.      Laptop and Phones ............................................................................................ 19

V.      Conclusion ..................................................................................................................... 20

## **Table of Authorities**

**Cases**

*Commonwealth v. Davis*,
  656 Pa. 213 ................................................................................................................ 23

*United States v. Doe*,
  465 U.S. 605(1984) ..................................................................................................... 23

*US v. Hubbell*,
  530 U.S. 27 (2000) ............................................................................................... 21, 23

Defendant Mauricio Chavez responds to the Receiver's Motion for an Order to Show Cause Why Defendant Mauricio Chavez Should not be Held in Contempt for Failing to Comply with this Court's Order Appointing Receiver [ECF No. 39] ("Receiver's Motion") and would respectfully submit that the Receiver's Motion should be denied.

## I.   Statement of Issues to be Ruled upon by the Court and Stage of Proceedings

The issue before the Court is whether it should issue an order to show cause why Mr. Chavez should not be held in contempt of this Court's Order Appointing Receiver.  The movant must prove contempt by clear and convincing evidence.[1]  This case is in the discovery phase.  No trial date has been set.

## II.  Summary of the Argument

While Mr. Chavez may have struggled to adjust to having his life turned upside down by the seizure of his business and his inability to retain counsel, he has not disregarded this Court's orders.  Among other things, Mr. Chavez has shown the Receiver around the around the office and introduced him to staff, Mr. Chavez and his counsel have turned over assets to the Receiver, and Mr. Chavez has permitted the Receiver to search and inventory his home.  Mr. Chavez's invocation of his Fifth Amendment rights, including the act of production privilege, prevents him from providing the sworn statements and materials the Receiver requests.

## III. Factual Background

The pleadings in this case to date give the impression that Mauricio Chavez devised an evil scheme to "target" the Latin community and defraud them of their money.  That is **not** what happened.

---

[1] Receiver's Motion [ECF No. 39] ¶ 27.

1

## A. Mr. Chavez Starts in Crypto.

Mauricio Chavez was born in El Salvador, but he has lived in the United States since he was in middle school.  He is a United States citizen.[2]  He started trading cryptocurrency for his own account in late 2015 at the age of 36.  At that time bitcoin's price hovered around $350.  Over the next several years, he traded and learned about bitcoin and its price just kept doubling and doubling again and again and again.  As people Mr. Chavez knew saw press reports of the fortunes being made in bitcoin and heard that he knew how to invest, they asked him to teach them about it.  He started giving seminars at Denny's restaurants explaining to people how they could open a bitcoin wallet and trade and invest.  As part of those classes, he would sometimes conduct live trades using his own bitcoin wallet.  Those trades were often profitable.  When the students saw this, they started asking if they could just give him money to trade for them.

## B. CryptoFX's Venture Agreements Disclosed Risk.

In early 2020, Mr. Chavez started CryptoFX along with his partner, Eduardo Taffinder, and Gustavo Gomez.  In exchange for a payment, students gained access to classes on how to trade crypto or forex and the chance for a return on what they had paid.  This was recorded in single-page carbon paper forms they called a "Venture Agreement," that had only the barest of terms. The forms had handwritten in the student's name, the amount they were contributing and whether they wanted their reward monthly, every three months, or six months.  The papers show generous potential returns that varied, but were most often 15% per month.[3]

Over time, the forms, which were printed in all caps, were modified and more terms and disclaimers were added to the still hand-completed forms, including provisions that "WE ARE

---

[2] The Receiver also asks the Court, without citing authority, or any actual support, to order Mr. Chavez to surrender his passport.  (Receiver's Motion [ECF No. 39] ¶ 30). There is no basis for any such relief against a person who is a citizen of the United States and not of any other country and who has lived exclusively in this country for his entire adult life.

[3] Ex. 25.

TAKING YOUR MONEY AND INVESTING IN OUR BEHALF.  IF WE RECEIVED (sic) ENOUGH RETURN ON CRYPTO CURRENCY, WE WILL REPAY THE STUDENT A PORTION OF THE TOTAL TUITION," "THE VENTURE IS VERY SPECULATIVE AND RISKY.  FOREIGN EXCHANGE AND CRYPTOCURRENCY TRADING IS HIGHLY SPECULATIVE AND THE STUDENT UNDERSTAND (sic) AND IS WILLING TO ASSUME THE ECONOMIC, LEGAL AND OTHER RISKS INVOLVED AND (B) IS FINANCIALLY ABLE TO ASSUME LOSSES," and that "THERE IS NO INVESTMENT PLAN."  The forms stated that "CRYPTOFX LLC IS A SIMPLE EDUCATIONAL ACADEMY NOT REGISTERED WITH THE TEXAS WORKFORCE COMMISSION NOR HAS ANY REGISTRATION WITH THE SECURITY AND EXCHANGE COMMISSION AS A DEALER OR AS AN AGENT NOR HAS ANY INSURANCE COVERAGE."[4]

Testimony has confirmed that the students were told and understood that "they could get 15 percent or they might get zero."[5]

### C.  CryptoFX's Classes were no Pretext.

The classes were not a pretext to solicit financial participation.  The classes were real. CryptoFX  had classes six days a week during the day and Zoom classes in the evening.[6]  They even taught classes in the early morning and at 10 pm, so the students could see live trades on various markets.[7]  One teacher testified that there were six teachers and he said students found his classes "valuable"[8] and one of the students testified that she "took a lot of classes" and "learned to open bitcoin wallets" and to "buy and sell bitcoin."[9]  Another testified she attended a forex class

---

[4] Ex. 25.
[5] Ex. 1 ("Saravia Tr.") 218:16 to 218:24; Gonzalez Tr. 254:9 – 257:17.
[6] Ex. 2 ("Benvenuto Tr.") 30:25 – 33:22.
[7] Benvenuto Tr. 30:25 – 33:22.
[8] Ex. 3 ("Taffinder Tr.") 369:2 to 370:23; Gonzalez Tr. 257:18 – 258:12 (Saw "a lot of people there . . . attending classes" and heard people "speak positively about learning a lot.")
[9] Saravia Tr. 218:25 - 219:3.

and three one-and-a-half hour-long crypto classes, but like some of us, "I just went, but I didn't learn."[10]  Mr. Benvenuto testified that the classes covered various topics like Ethereum and Shiba and "how do you set up a virtual wallet."[11]  He did not recall "a pitch for investment or trading with CryptoFX . . . being part of the classes."[12]  "[I]t was a true learning experience."[13]  After the Receiver shut down the CryptoFX office, some people wanted their money back, but "[s]ome people were concerned about the – the classes."[14]

### D.  CryptoFX's Returns were far Below What Crypto was Offering.

The 15%, or in some cases, 20%, potential returns referenced in CFX's venture agreements may now look generous in hindsight, but they looked skinny at the time given what was happening in the crypto market.  In the 20 months from March 2020 to November 2021, bitcoin's price went up 1,125% (from $5,343 to $65,509.87).  It was not unreasonable for Mr. Chavez and the others at CryptoFX to believe they could provide the referenced returns.  One witness testified that Mr. Chavez once told him he had made $50,000 in five minutes and then showed him the transaction on his phone.[15]  Texts that a CryptoFX forex trader sent to Mr. Chavez include statements like, "24 hours back in the market and we have done 27% not bad," "$1.5M [profit] this week," "2.2 this week brother," and over the course of two days:  "5Mill this week.  It's done already," "1M down [meaning $1 million realized profit]," to which Mr. Chavez responded "I know bro, That's amazing," "1.3M down," "$1.6 M," to which Mr. Chavez responded with

---

[10] Ex. 4 ("De La Cruz") Tr. 22:13 to 23:2.  Her friend disagreed, testifying that while she never traded crypto, "but she had a lot of knowledge." Taffinder Tr. 54:7 to 55:3.
[11] Benvenuto Tr. 32:23 – 33:22.
[12] Benvenuto Tr. 32:13-32:22.
[13] Benvenuto Tr. 32:13-32:22.
[14] Taffinder Tr. 36:1 – 36:6.
[15] Taffinder Tr. 111:21 – 112:20.

clapping hands emojis, and finally, the forex trader reported a profit of "2,120,000.00" over those two days.[16]

**E.  CryptoFX Grew Beyond its, or Mr. Chavez's, Management Capabilities.**

With the exploding public fascination with crypto and spreading word of mouth, the CFX "office" grew from a few guys working at a table at Panera Bread (and teaching classes in a motel conference room) to having an office that was so busy that other tenants were complaining and "building management threaten[ed] to cancel CryptoFX's lease as a result of too much uncontrolled foot traffic caused by the increased business."[17]  Even after CryptoFX moved to even larger space in its own building, parking was still a problem.[18]

Mauricio Chavez's role was to trade crypto (and to some degree forex).[19]  The administration of the office was more the role of Gustavo Gomez and Eduardo Taffinder. Mr. Taffinder "primarily, he handled more of the day-to-day -well, what I would – it appeared to me he handled the day-to-day operations of that business."[20] "Eduardo [Taffinder] ran the office environment; Mauricio ran the trading as it were; and I understood that Gustavo [Gomez], I guess handled the education piece, slash, the crypto trading as well."[21]  But in the first half of 2021, Mr. Chavez and Mr. Gomez had a falling out and Mr. Gomez left the firm, which left only Mr. Taffinder to handle the administration of the business.[22]  But then a few months later, tragically Mr. Taffinder - "the guy that kind of held it together,[23] - contracted COVID and fell into a coma and died.[24]  So, Mr. Chavez was left alone with a management task for which he was

---

[16] Ex. 7 (excerpts).
[17] Benvenuto Tr. 88:13 – 88:24 and 49:25 – 52:16.
[18] Ex. 6 ("Turcios Tr.") 78:20 – 79:14.
[19] Benvenuto Tr. 28 (Chavez "was the main trader at that point because he didn't actually do any teaching.")
[20] Benvenuto Tr. 27-28.
[21] Benvenuto Tr. 51.
[22] Ex. 5 ("Gonzalez Tr.") 260:8 – 261:9.
[23] Benvenuto Tr. 120:5 – 120:10.
[24] Gonzalez Tr. 260:8 – 261:9.

terribly ill-suited and that neither he – nor likely anyone – could have handled.

CryptoFX's operation had no real management structure and almost no systems or formal procedures. As the public fascination with crypto grew, CryptoFX was taking in and paying out ever growing sums – mostly in cash - and its primary record-keeping method was still the single-page carbon paper forms that were filled in by hand when money was received and then annotated - again in handwriting - when funds were paid out. The business was understaffed. As Mr. Benvenuto put it in a text "I will take anybody you throw at us but we need more admin help."[25] The firm had a few people assigned to bookkeeping and some of them apparently made spreadsheets and some effort to track transactions, but the business lacked any central or effective method of tracking how much it was taking in and how much it planned to try to pay out. It had no CPA, no HR program (the late Mr. Taffinder had handled that), and no real CRM system. To make matters worse, because the company had "crypto" and "FX" (a/k/a foreign exchange) in its name, it could not even keep a bank.[26] CryptoFX had to change banks at least three times.

One witness who was just one of the people with responsibility for receiving and disbursing funds testified that he bought his own spiral-bound receipt book so he would have something for people to sign when they came in for payments and had only a picture of their CFX contract on their phone.[27] He did not know whether other people kept such receipts, it was just something "he did personally" and he kept those records in his possession.[28] That same witness testified that he bought a safe to keep CFX funds.[29] Another witness testified that she too bought a safe and that only she (and not anyone else at CFX, including Mr. Chavez) had the combination to it.[30] She was

---

[25] Ex. 8.
[26] Benvenuto Tr. 112:6 – 112:15.
[27] Turcios Tr. 115:4 - 125:9.
[28] Turcios Tr. 116:3 - 116:20.
[29] Turcios Tr. 113:19 – 113:21.
[30] Saravia Tr. 197:8 - 198:16.

one of the people who accepted contracts and received and disbursed money, but she and others just came in and left when they liked. When asked whether someone at CFX "organized various shifts the people worked," she responded "That was if I wanted to go, I would go. If not, not."[31] When she was again asked, "And people in your role would come in and out?" she explained, "Yes, we didn't have a schedule."[32]

CFX had no IT department, or even an IT person. When one witness was asked what people would do if they had IT problems, he explained that "[p]eople would ask me for assistance as the crypto teacher."[33] But, in addition to not being an IT person, he was not there all the time, so if people needed help in his absence "resetting passwords or anything like that," he explained, "Oh, that was their – their own doing."[34] Passwords were "individually managed by the device owner . . . each employee would manage their own computer."[35]

Mr. Chavez was the polar opposite of a hands-on manager. In 2021 his marriage was failing and after his falling out with Mr. Gomez, Mr. Gomez threatened him physically, so Mr. Chavez had to pretty much stop coming into the office. As Mr. Benvenuto testified, Mr. Chavez was "looking like he's stressed out" and "at that point, I knew something was up, and I could see the office becoming more disorganized as he did not appear – did not make appearances at the office any longer."[36] "CryptoFX, had evolved to the point they – they needed more bodies, they needed more staff. And unfortunately, because of what was going on in Mauricio [Chavez]'s personal life, he didn't witness what I witnessed."[37] The text messages produced are full of pleas

---

[31] Saravia Tr. 149:10 – 149:15.
[32] Saravia Tr. 149:15 – 149:17.
[33] Taffinder Tr. 330:23 – 331:7.
[34] Taffinder Tr. 331:3 – 331:12.
[35] Taffinder Tr. 331:15 – 331:22.
[36] Benvenuto Tr. 49:12 – 49:24.
[37] Benvenuto Tr. 71:11 - 72:10.

to Mr. Chavez like, "Everybody is looking for you"[38] and "[I] have been trying to reach out multiple times and there has been no communication in return at all. . . . I understand you may be going through many things right now."[39]  While Mr. Chavez would improve some with time and others, including Julio Taffinder (the son of Mr. Chavez's late partner, Eduardo Taffinder) and Mr. Benvenuto, tried to help out, the company was still mostly unmanaged.  Julio Taffinder said that in his months at CryptoFX, he only saw Mr. Chavez in the office during business hours one time.[40]

As the SEC points out in its Complaint, CryptoFX had a two-tiered referral program where "Sponsors" were paid 7% for people they introduced to the program and 3% for people those others referred to the program.[41]  This program further complicated attempts, such as they were, to track finances, because these commissions were also recorded in handwriting on the single-page carbon paper forms.  There was apparently little or nothing beyond that form to track primary and secondary referrals.  The persons owed the commissions had to keep track of it themselves.[42]  One witness testified that she received a $90,000 payment (a remarkably round number) for commissions and contract payments for one period, but she was not aware of any record that broke out how much was for commissions and how much was for contracts she owned, and she could not remember whether it was correctly calculated.[43]

Not surprisingly, this system did not work very well.  One witness testified that he learned months after the fact that some of his referrals had made further referrals on which he had not been

---

[38] Ex. 9.
[39] Ex. 10.
[40] Taffinder Tr. 370:24 – 371:13.
[41] SEC Complaint [ECF No. 3] ¶ 21.
[42] Turcios Tr. 69:8 – 71:20.
[43] Saravia Tr. 128:22 – 129:16.

paid his 3%.[44]  He learned this when some people came to his house and told him.[45]  He had no idea what would happen to the referral fee if someone lost the paper form.[46]  When asked how he kept track of commissions, he explained, "You cannot have ever something exact or a correct amount."[47]

Of course, there is nothing improper about a referral program and the testimony to date suggests such "network marketing" programs were quite common in the Latin community.  One witness testified that she had been in four such programs prior to CryptoFX, starting with Amway, which she explained was still operating today and "has been around for 50 years."[48]  And, at the time of her deposition, she was looking forward to a trip to Dubai that she received for inviting nine people to join yet another program in which she is currently participating.[49]

CryptoFX did not advertise, but with the public's growing fascination with bitcoin the business still grew far beyond anything its systems could handle.  Cryptocurrency was all over the news and the limit was beyond the sky.  El Salvador adopted bitcoin as legal tender.[50]  JP Morgan compared it to **gold** and said it could reach $146,000 per bitcoin. [51]  The retirement giant Fidelity "launched a way for workers to put some of their 401(k) savings and contributions directly in bitcoin."[52]  The 2022 Superbowl featured not one, but four, ads for crypto products.[53]  eToro's ad included the song "Fly me to the Moon."[54]  FTX's ad had Larry David comparing crypto to

---

[44] Turcios Tr. 77:19 – 78:12.
[45] Turcios Tr. 77:19 – 78:12.
[46] Turcios Tr. 68:6 – 68:9.
[47] Turcios Tr. 70:17 – 70:20.
[48] Saravia Tr. 217:4 - 218:15.
[49] Saravia Tr. 37:1 - 37:12.
[50] Ex. 11.
[51] Ex. 12.
[52] Ex. 13.
[53] https://en.wikipedia.org/wiki/List_of_Super_Bowl_commercials#2022_(LVI)
[54] https://www.youtube.com/watch?v=7O4rP3qwIfo

innovations like the wheel and included the tag line "Don't Miss Out On Crypto," reflecting the widespread fear of missing out that was driving the market.[55]

But the decline that had started in November 2021 continued and by mid-2022, bitcoin was down to about $20,500, which is about where it is today. Despite those devastating declines, CryptoFX still paid returns to all its investors until it was shut down by the Receiver.[56] And, of course, it is still early days for crypto. It was not that long ago that there was a "tech wreck" market collapse that appeared to spell the end of investing in companies that purported to allow you to order groceries (Webvan.com) or dogfood (pets.com) over the internet, but both practices are common today (see, e.g., Kroger.com and Chewy.com).

### F. The Candid Texts Belie Any Claim of Fraud.

The evidence in this case already includes hundreds of pages of text messages. But in those remarkably candid, contemporaneous messages, there is not a single reference to Mr. Chavez trying to target, or cheat, or defraud anyone. To the contrary, they reflect concern that the company might not be complying with TWC and IRS regulations and the desire to bring it into regulatory compliance and obtain a license from the SEC. Those text messages even include talk of who would be their broker "when we actually are granted the license to be a dealer entity."[57] Mr. Chavez responded to that text by writing "Lets do it brother."[58]

### G. Mr. Chavez did not try to Hide any Assets.

It is also clear that Mr. Chavez did not attempt to hide any assets. The few corporate entities he formed (using LegalZoom) are all registered in his own name on the records and website of the Texas Secretary of State.[59] The SEC itself alleges that the defendants "diverted several

---

[55] https://www.youtube.com/watch?v=hWMnbJJpeZc
[56] Saravia Tr. 220:2 – 220:5; Benvenuto Tr. 194:14 – 195:1; Turcios Tr. 66:7 – 66:9.
[57] Ex. 14.
[58] Ex. 14.
[59] See, e.g., Ex. 15; Ex. 16.

million dollars in investor funds to the Relief Defendant, CBT Group, LLC ("CBT Group"), a real estate development company they co-own."[60]  CBT was registered with both the Texas Secretary of State and the United States IRS with Mr. Chavez's name.  CBT's primary assets are immovable real estate in Texas that the Receiver has had no difficulty locating.  Indeed, the Receiver has already listed two of the properties for sale.[61]  The Receiver also recovered over $440,000 of cash from the CryptoFX offices and over $3.5 million in various bank and crypto accounts.[62]  In total, the Receiver has already found more than $10.3 million in assets.[63]

### H.  Mr. Chavez's Efforts to Comply with the Court's Order.

Prior to asserting his Fifth Amendment privilege, Mr. Chavez sat for a full day of deposition by the SEC in which he answered as best he could every question the SEC had for him. After the Receiver was appointed in this case, Mr. Chavez and his counsel at that time went with the Receiver and his lawyer to the offices of CryptoFX.  Mr. Chavez then spent several hours there touring the office with them, introducing the Receiver to people in the office, and showing the Receiver the security camera system in the office.

To be sure, Mr. Chavez has struggled with seizure of the business and even his personal assets and with being thrust into a legal system he does not understand.  Mr. Chavez had never had anything more than a speeding ticket prior to this case.  His struggles have been exacerbated by his struggles to retain counsel.  The counsel who had been representing Mr. Chavez and Mr. Benvenuto terminated the representation because of a potential conflict.  Mr. Chavez then moved to a prior counsel, but that counsel moved to withdraw on November 3, 2022.[64]  This left

---

[60] SEC Complaint [ECF No. 3] ¶3.
[61] Receiver's First Interim Report [ECF No. 33] ¶ 25.
[62] Receiver's First Interim Report [ECF No. 33] ¶¶ 4 and 15 and [ECF No. 33-9] at 2.
[63] Receiver's First Interim Report [ECF No. 33] ¶ 3.
[64] Unopposed Motion to Withdraw as Counsel [ECF No. 25].

Mr. Chavez needing to find counsel with all of his assets frozen.[65]  Mr. Chavez was essentially without counsel in this case from then to December 2, 2022, when the undersigned counsel appeared in this case.[66]

The same day that the undersigned counsel appeared in this case, he emailed counsel for the Receiver that Mr. Chavez would be turning over a fully paid for Mercedes SUV to the Receiver.[67] Mr. Chavez did so the next day.

The Monday following the undersigned counsel's appearance in the case, he informed counsel for the SEC and counsel for the Receiver, "Regarding the requests for sworn accounting and information, [Mr. Chavez] cannot do that since his records were all seized and because he would assert his 5th Amendment rights."[68]

At about the same time, Mr. Chavez's criminal counsel (David Gerger) delivered to the Receiver over $189,000 from a retainer Mr. Chavez had provided him.[69]  One of Mr. Chavez's prior civil counsel also returned over $150,000 that he had held as a retainer.[70]  Mr. Chavez's current counsel has no retainer.

Between December 7 and December 15, the undersigned counsel also appeared and attempted to effectively question witnesses at five more than full-day depositions in a case he knew almost nothing about.  There had already been a deposition of Mr. Chavez's estranged wife during the period when Mr. Chavez was not represented by counsel.

---

[65] Mr. Chavez would likely still be looking for counsel today had the Court not provided in its Order Appointing Receiver that the Receiver shall make allowances for reasonable attorneys' fees for the Defendants.  [ECF No. 011].
[66] Notice of Appearance [ECF No. 034].
[67] Ex. 17.
[68] Ex. 18.
[69] Receiver's First Interim Report [ECF No. 033-9] at 2.
[70] Receiver's First Interim Report [ECF No. 033-9] at 2.

On December 24, 2022, in response to the SEC's concerns that some websites of the business were still functional, the undersigned wrote to inform them that the "websites no longer work."[71]

The undersigned counsel informed the Receiver on December 27, 2022, that he had $55,000 to be turned over to the Receiver.[72]

On January 10, 2023, Mr. Chavez's counsel escorted the Receiver, the Receiver's counsel, and an appraiser to Mr. Chavez's personal residence.[73]  There they spent two hours searching and inspecting his personal possessions.  They looked in every drawer, cabinet, and laundry hamper in his apartment, including his bedroom and bathroom.[74]  Mr. Chavez has also agreed to permit the Receiver to search a house Mr. Chavez had purchased.  The same day as the Receiver's search of his apartment, Mr. Chavez received an eviction notice from his landlord.[75]  So, now he faces having to find a new place to live, which will be challenging since he does not even have a bank account.

Since the undersigned counsel appeared in the case, the Receiver has also served at least a dozen subpoenas on banks, credit card companies, and others with whom Mr. Chavez had done business.  Mr. Chavez has not objected to any of those subpoenas.

The undersigned has been working with Mr. Chavez to develop a budget and request for allowance for living expenses to submit to the Receiver, but with the press of other matters, and Mr. Chavez's struggles with his situation, they have not yet been able to complete that process.

---

[71] Ex. 19.  Another website, laacademia247.com, about which the Receiver expressed concern is also no longer functional.
[72] Ex. 20.
[73] Ex. 21.
[74] Ex. 21.
[75] Ex. 22.

Throughout this time, Mr. Chavez has also had to deal with having his life turned upside down.  He receives calls daily from disgruntled participants and former friends, some of whom threaten his life.[76]  On December 14, 2022, some of those contract-holders and community activists held a rally in front of the federal courthouse.[77]  Some held large pictures of Mr. Chavez with his personal information.[78]  The attendees, and those who saw this reported on the news, were encouraged to harass Mr. Chavez (and others).  Mauricio Chavez fears not only for his own safety, but that of his four-year-old daughter and others he cares about.

## IV. The Receiver's Issues

Since the undersigned counsel entered this case on December 2, 2022, he has emphasized repeatedly and forcefully to Mr. Chavez his need to comply with the Court's orders.  As outlined above, Mr. Chavez has taken many steps to do just that and he has committed to continuing those efforts.

### A.  Sworn Statements

The Receiver argues that Mr. Chavez should be held in contempt because he has not provided "the sworn statement and accounting required by the Receivership Order" and has "blatantly ignored," the Receiver's requests for such information.[79]  Mr. Chavez has not ignored any requests, at least not since the undersigned counsel has appeared in this case.  The next business day after the undersigned counsel appeared in this case, he wrote to the Receiver's counsel (and counsel for the SEC) and explained, "Regarding the requests for a sworn accounting and information, [Mr. Chavez] cannot do that since his records were all seized and because he would assert his 5th Amendment rights."[80]  Mr. Chavez had started asserting his Fifth Amendment rights

---

[76] Turcios Tr. 187:25 – 188:8.
[77] Ex. 23.
[78] Ex. 24.
[79] Receiver's Motion [ECF No. 39] at p. 9, ¶
[80] Ex. 18.

14

even before this case was filed.  He provided the SEC with a detailed declaration asserting his

Fifth Amendment rights, which the SEC even attached to its motion for TRO in this case.[81]  On

December 27, 2022, the undersigned counsel again explained that Mr. Chavez was asserting his

rights under the Fifth Amendment and that, even if he were not, he could not provide an

accounting[82]:

> Regarding paragraphs 9 and 10 of the order, those paragraphs call for sworn statements
> and accountings. Mauricio [Chavez] is asserting his Fifth Amendment rights against
> providing such things. He has been asserting his Fifth Amendment rights ever since his
> June 7, 2022 Declaration.  I told Matt Gulde [counsel for the SEC] at one of the deposition
> breaks that he was still taking the Fifth and I believe I wrote that to you in a prior email.
> Matt said something about possibly needing Mauricio to update the Declaration. I don't
> think doing that would be a problem, but I defer to Mauricio's criminal lawyer for the final
> say on such issues. Moreover, as a practical matter, I don't think Mauricio could provide
> an accounting or the other information requested, especially since he no longer has access
> to the company records.

**B. Cars**

The Receiver complains that Mr. Chavez has not turned over some cars.[83]  As explained

above, Mr. Chavez returned a fully paid for Mercedes the day after the undersigned counsel

appeared in this case.  He has one other car, a BMW SUV.  It is not paid for and he needs it to

transport himself and his daughter.  Given that he owes money on that car, it would not likely have

much value in any case.  The other cars the Receiver references are not in Mr. Chavez's possession.

The Volkswagen Tiguan, the Volkswagen Atlas, and the Mercedes GLS are all in the

possession of Mr. Chavez's estranged wife (and the mother of his daughter), Angelica Vargas.[84]

The undersigned counsel's understanding is that none of those cars are in Mr. Chavez's name and

he does not have possession of any of them, so he cannot deliver them to the Receiver.  Mr. Chavez

---

[81] Plaintiff's Motion for Preliminary Injunction, *Ex Parte* Temporary Restraining Order, Asset Freeze, etc. [ECF No. 006], Appendix Ex. B.
[82] Ex. 20.
[83] Receiver's Motion [ECF No. 039] at p. 5.
[84] At her deposition, Ms. Vargas testified that she had the Mercedes and a Volkswagen and, as to the Mercedes at least, it was titled in her name and not Mr. Chavez's.  (Vargas Tr. 35:4 – 35:9).

has no objection to the Receiver taking possession of two of those cars, but Ms. Vargas needs one for herself and for her two daughters.  Coordination of delivery of those cars would need to be arranged with Mr. Chavez's estranged wife's counsel.

The remaining car is a Lexus ES.  According to the Receiver, that car is titled in the name of JM Monarchy, an LLC of which both Mr. Chavez and Ms. Gonzalez are members.  However, Mr. Chavez does not have possession of that car.  It is in the possession of Ms. Gonzalez and she drives it.  In her deposition, Ms. Gonzalez confirmed that fact and that Mr. Chavez sold it to her/JM Monarchy for $35,000.[85]  Accordingly, again, any turnover of that vehicle should be coordinated with Ms. Gonzalez's counsel.

### C.  Mr. Chavez's 2021 Tax Return

The Receiver acknowledges that he already has a copy of Mr. Chavez's 2020 tax return but complains that Mr. Chavez has not provided a copy of his 2021 tax return.  Putting aside the privilege issue (addressed below), Mr. Chavez does not have a 2021 tax return.  The reasons for this include, but may not be limited to, the fact that Mr. Chavez's tax preparer died and the fact that when the Receiver was appointed, Mr. Chavez lost access to the records any preparer would need to be able to prepare such a return.

### D.  Corporate and Trust Documents

The Receiver argues that Mr. Chavez failed to turn over documents about JM Monarchy LLC, Luxury Real Estate LLC, JJ Trust, and JCA Trust.[86]

As the Receiver already knows, JM Monarchy owns one house at 24923 Tidmor Lane, which Mr. Chavez has agreed to let the Receiver tour/search, and it owns one car, the Lexus ES referenced above.  JM Monarchy has no office, no employees, and no other assets.

---

[85] Gonzalez Tr. 224:19 – 227:4.
[86] Receiver's Motion [ECF No. 039] at 7.

Luxury Real Estate owned a house at 2030 Greenhaven Court in Missouri City, Texas prior to it being transferred to the JJ Trust.  The Receiver already knows that, too.  Luxury Real Estate also has no office, no employees, and no assets.[87]

The JJ Trust and the JCA Trust are both trusts established by Ms. Gonzalez.  Mr. Chavez does not claim to be a settlor, trustee, or beneficiary of those trusts or to have any interest in those trusts.  Ms. Gonzalez testified that she used LegalZoom to establish each of those trusts (one for her brothers and one for her son) with herself as the sole trustee.[88]  Ms. Gonzalez testified that she had the documents for at least one of those trusts and offered to send them to the Receiver's counsel.[89]  It is the undersigned counsel's understanding that after her deposition, Ms. Gonzalez's counsel did, in fact, provided the documents for those trusts to the Receiver's counsel.

### E.  Continuing Operations

The Receiver complains that CryptoFX operations continued after the TRO was entered and even to some degree after the Receiver was appointed.  While CryptoFX apparently continued operating after the TRO and perhaps for a time after the Receiver was appointed, the undersigned understands that Mr. Chavez has had no involvement in any such operations since the time the undersigned counsel entered the case on December 2, 2022.  On the day the undersigned filed his appearance, he spoke with counsel for the SEC about his concerns about ongoing operations.  The following business day, the undersigned wrote: "I have heard both of your [the SEC's and the Receiver's] concerns about people continuing to solicit people for CFX and I have emphasized to Mauricio [Chavez] his need to have nothing to do with anything like that."[90]

---

[87] Gonzalez Tr. 56:14 – 56:20, 58:4 – 58:6, 86:8 – 86:9.
[88] Gonzalez Tr. 207:14 – 207:22 and 223:3 – 223:15.
[89] Gonzalez Tr. 222:24 – 223:2.
[90] Ex. 18.

Many people at CryptoFX had operated largely autonomously from Mr. Chavez long before the SEC filed this case. That practice apparently continued after this case was filed. For example, the Receiver complains that "at the direction of Chavez, CryptoFX investors were asked via WhatsApp messages to come to the CryptoFX offices on Park Drive, Houston, Texas with their contracts in October 2022."[91] But in the testimony the Receiver cites, the witness actually said that the WhatsApp posting "does not come directly from the academy" and that he "talked to my friend Ena and together we created this message."[92] He said some of the information in the posting came from "Nancy," and that he thought she got it from Mauricio, but that Nancy did not "say anything about Mauricio."[93] He testified that he had had a "brief call" with Mauricio, but that he did not give him "any idea about how reimbursements might happen" and that he did not "run any of this by Mauricio before [he] sent it."[94] And, again, to the extent Mr. Chavez may have been involved that was long before the undersigned counsel became involved in this case.

### F. Passwords and Safe Combinations

The Receiver complains that Mr. Chavez has failed to provide passwords and access codes for CryptoFX computers, safes, and security system.[95] First, as explained above, Mr. Chavez is asserting his Fifth Amendment rights, which would cover all such information in his head.[96] Second, witnesses have already testified that Mr. Chavez never had the combination to at least two of the safes and that passwords were "individually managed by the device owner . . . each employee would manage their own computer."[97] In any case, the Receiver has already gained access to the

---

[91] Receiver's Motion ¶ 14.
[92] Turcios Tr. 153:18 – 154:17.
[93] Turcios Tr. 156:23 – 158:13.
[94] Turcios Tr. 158:20 – 160:3.
[95] Receiver's Motion at pp. 4-5.
[96] A witness cannot be compelled to disclose combinations and passwords in his own mind. *US v. Hubbell*, 530 U.S. 27, 43 (2000).
[97] Taffinder Tr. 331:15 – 331:22.

safes and the cash therein.[98]  The security system only retained recordings for a day or two and in any case, the Receiver has also apparently accessed the security system.[99]

### G.  Funds

The Receiver complains that Mr. Chavez has not delivered more money to the Receiver and claims that records show "Chavez himself received at least $607,000."[100]  But the Receiver does not base this on some receipts signed by Chavez or any wire transfer records.  It is apparently based on "Daily Records."[101]  Those records include one note that somewhat cryptically states "$127,000 LO TOMO MAURICIO" [Mauricio took], and other entries that do not mention Mauricio Chavez at all.  Rather, they state only "Entrega Cash," meaning "cash delivered."  For reasons not stated, the affiant claims to "understand[] that all of these references indicate the cash that was delivered to o (sic) Chavez."[102]  The Receiver also acknowledges that funds were also being paid out to students during this same time, which would have diminished any such funds in Mr. Chavez's possession.  In any case, Mr. Chavez does not have any $607,000 to deliver to the Receiver.

### H.  Laptop and Phones

The Receiver complains that Mr. Chavez has failed to turn over his computer and cell phones.  These devices were purchased by Mr. Chavez personally, not by CryptoFX.  They contain personal, intimate information and communications with his counsel.  The undersigned counsel has taken possession of them and delivered them to a forensic expert for preservation.  Mr. Chavez's Fifth Amendment privilege covers the act of production of such items.  This Court

---

[98] Receiver's First Interim Report [ECF No. 33] ¶ 27j and Ex. I [ECF No. 33-9] at 2.  The Receiver also complains of needing passwords to a Google drive, but it appears the Receiver obtained access at the deposition of Mr. Taffinder. (Taffinder Tr. 106:7 – 106:11).
[99] Receiver's Motion [ECF No. 039] Ex. C [ECF No. 039-3].
[100] Receiver's Motion [ECF No. 039] at p. 6.
[101] Receiver's Motion [ECF No. 039] Ex. E [ECF No. 39-5] ¶ 9.
[102] Receiver's Motion [ECF No. 039] Ex. E [ECF No. 39-5] ¶ 8.

was careful to note in its orders and in its comments at the hearing regarding appointment of the Receiver that the Receiver "shall not have the power to waive the Fifth Amendment rights of the individual defendants; nor can he compel a waiver of their attorney-client privilege."[103]  "The receiver can't waive the privilege either. . . I think he would know that instinctively, but if he didn't, I'm saying it now."[104] That privilege, of course, includes the act of production privilege. *See, e.g., United States v. Doe*, 465 U.S. 605, 613-16 & n.11 (1984) (holding that the "act of producing" business records in response to a subpoena is protected by the Fifth Amendment because enforcement would compel the witness to admit that the records exist, that they are in his possession or control, and that they are authentic); *United States v. Hubbell*, 530 U.S. 27, 43-44 (2000) (holding that the Fifth Amendment is implicated where the target of a subpoena must use "the contents of his own mind" to identify responsive documents or where he is compelled to identify sources of evidence); *Commonwealth v. Davis*, 656 Pa. 213 at 234-235, 220 A.3d 534 (Pa. 2019) (revealing password to seized computer was testimonial and protected by Fifth Amendment; see also cases cited therein.).

Here there is certainly no compelling need that would justify prejudicing Mr. Chavez's Constitutional rights.  If the Receiver believes there is actual value in the devices themselves, Mr. Chavez should be permitted to remove and preserve the information prior to delivering the property to the Receiver.

## V.  Conclusion

For the reasons stated above, the Receiver's motion should be denied.

---

[103] Order Appointing Receiver [ECF No. 011] ¶ 7L.
[104] September 29, 2022 Hearing Transcript at p. 16.

Respectfully submitted,


By: */s/ Paul D. Flack*
Paul D. Flack
TBA # 00786930
SD Texas ID No. 17461
pflack@prattflack.com
Pratt & Flack, LLP
4306 Yoakum Blvd., Suite 500
Houston, TX 77006
(713) 705-3087

**Counsel for Defendant Mauricio Chavez**

### CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on all counsel of record via the Court's CM/ECF electronic service of process on or before January 17, 2023.


_____
Paul D. Flack

21