1            IN THE UNITED STATES DISTRICT COURT

2             FOR THE SOUTHERN DISTRICT OF TEXAS

3                     HOUSTON DIVISION

4

5   SECURITIES AND EXCHANGE )
    COMMISSION,              )
6                            )
        Plaintiff,           )
7                            )
    vs.                      ) Case No. 4:22-cv-3359
8                            )
    MAURICIO CHAVEZ,         )
9   GIORGIO BENVENUTO, and   )
    CRYPTOFX, LLC,           )
10                           )
        Defendants.          )
11                           )
        and                  )
12                           )
    CBT GROUP, LLC,          )
13                           )
        Relief Defendant.    )
14  _____)

15

16

17              ORAL VIDEOTAPED DEPOSITION

18             MR. ORLIN W. TURCIOS-CASTRO

19                   December 8, 2022

20

21

22

23

24  Reported by:
    Michelle Hartman
25  JOB No. 221208WWC

                                                        1

1          ORAL VIDEOTAPED DEPOSITION OF MR. ORLIN W.

2     TURCIOS-CASTRO, produced as a witness at the instance

3     of the Plaintiff and duly sworn, was taken in the

4     above-styled and numbered cause on the 8th day of

5     December, 2022, from 9:17 a.m. to 6:18 p.m., before

6     Michelle Hartman, Certified Shorthand Reporter in and

7     for the State of Texas and Registered Professional

8     Reporter, reported by computerized stenotype machine

9     at the offices of Shook, Hardy & Bacon, LLP, JPMorgan

10    Chase Tower, 600 Travis Street, Suite 3400, Houston,

11    Texas 77002, pursuant to the Federal Rules of Civil

12    Procedure and the provisions stated on the record or

13    attached hereto.

14

15

16

17

18

19

20

21

22

23

24

25

2

1   that they were -- there were classes also, but that

2   basically they were doing trading and that that was

3   the return.

4          Q.  Did he show any records that reflected

5   the trades?

6          A.  No.

7          Q.  In this time, did you ever hear of CFX

8   not being able to make its payment?

9          A.  No.

10         Q.  And Ivonne never asked to see any

11  evidence of actual crypto currency trading?

12         A.  Not that I know.

13         Q.  So she opened a $10,000 contract that

14  day; is that right?

15         A.  Yes.

16         Q.  Did you receive a referral payment for

17  bringing her in?

18         A.  Yes, everybody would get a bonus referral

19  of seven percent.

20         Q.  So did you get seven percent of $10,000

21  on that day in January 2021 when Ivonne invested?

22         A.  Yes, they would give it to you later on,

23  like two or three weeks after.

24         Q.  Okay.  How would that be recorded to you,

25  did you have to take any documentation in to show

                                                        66

```
 1   yellow piece of paper with the same information?
 2        A.   Yes.
 3        Q.   And was there ever more than two pieces
 4   of paper?
 5        A.   I never saw that.
 6        Q.   What would happen to your ability to
 7   collect a referral fee if Ivonne lost her contract?
 8        A.   Honestly, I don't know.  I don't have the
 9   answer for that, but they always paid.
10        Q.   Did you ever hear of that happening,
11   someone losing their contract?
12        A.   No.
13        Q.   Now, the seven percent was not the only
14   type of referral fee, correct?
15        A.   They also had a two percent.
16        Q.   And can you tell us how that worked?
17        A.   For example, if I would invite you, they
18   would give me the seven percent.  If I would invite
19   you and you would invite her, you would get the seven
20   percent and I would get the three percent, and that
21   would be it.
22        Q.   Nobody gets -- or you wouldn't get
23   anything if -- if she signed somebody else up?
24        A.   If she would invite somebody else, then
25   she would receive the seven, you would receive the
```

68

1   three, and I would stop receiving.

2          Q.  Okay.  How do you keep track of who --

3   who I'm referring?

4          A.  For example, if I would invite you, you

5   would be aware of the people that have referred

6   because this was not another way.

7          Q.  I'm not sure I understand your answer.

8          So let me ask this:  How many people --

9   in the sum of your experience with CFX, how many

10  people did you refer?

11         A.  Tops, eight to ten people.

12         Q.  And you received seven percent for each

13  of those?

14         A.  For the first referral.

15         Q.  Okay.  And then did any of those people

16  make referrals themselves?

17         A.  Yes, a lot of the people that would get

18  to -- in the office of Aqua Remach, I didn't even

19  know them.

20         Q.  But I'm asking you a more specific

21  question.  The people that you referred personally,

22  you know that they also made referrals?

23         A.  Yes.

24         Q.  Okay.  And so you were making the point

25  that a lot of them you haven't even met?

                                                    69

1              A.   The ones that were referred by them.

2              Q.   But you could still collect three percent

3     for each of their investments?

4              A.   No.   I'm going to explain why.   No,

5     because I'm going to explain why.   If I would invite

6     you and you would open a contract, then I would

7     receive the seven percent; but then if you would

8     decide to open a second contract, then I -- you would

9     receive that seven percent and I would only receive

10    three percent; and then if that person continued

11    inviting people, then he would get the two bonuses

12    because he had two contracts open.

13             Q.   So for you to receive a three percent

14    bonus, your referrals would only have to be in for a

15    maximum of one contract?

16             A.   Yes.

17             Q.   That is more complicated than I had

18    realized.   So how did you keep track of it?

19             A.   You cannot have ever something exact or a

20    correct amount.

21             Q.   Who was keeping track?

22             A.   What I would say, if I would invite you,

23    I would say you are responsible of the people that

24    you invite, because I would not even know the people

25    that you are going to invite; and I would teach the

70

1   people to say the same thing with the people that

2   they would invite, "You are responsible for the

3   people that you invite."

4          Q.   And by "you are responsible," do you mean

5   you're responsible for getting the information from

6   the people you invite about who they are inviting?

7          A.   Yes, because I was not able to have

8   control of all of that.

9          Q.   Was anyone at CFX keeping traffic of that

10  and making sure that people got their seven percent

11  and their three percent correctly?

12         A.   Yes, because you would go to the office

13  to collect it.

14         Q.   And would you see any records other than

15  the contracts that you've talked about that supports

16  whatever calculation that they were presenting as

17  correct?

18         A.   No, I never saw a document.  But I do

19  know that people would be paid at seven percent or

20  three percent.

21         Q.   Did you also get a referral fee for

22  Carmen?

23         A.   Yes.

24         Q.   For Hans?

25         A.   Yes.

                                                    71

1   record.

2                    THE VIDEOGRAPHER:   The time is 12:01

3   p.m., and we are off the record.

4                        (Recess taken)

5                    THE VIDEOGRAPHER:   The time is 1:36 p.m.,

6   and we are on the record.

7        Q.   (BY MR. GULDE)   Mr. Turcios, we had been

8   talking about how CFX's business started to be

9   conducted out of the Aqua Rematch offices, and we

10  discussed Ivonne getting involved in CFX.

11                   So would you continue telling us that,

12  and what happened after Ivonne started her first

13  contract with CFX.

14                       (Phone buzzes)

15                   MS. AGUILAR:   Give me a moment, please.

16                   THE VIDEOGRAPHER:   Pardon?

17                   MS. AGUILAR:   Just give me a moment to

18  turn this phone off.

19        A.   Yes, in January when I went to collect my

20  money of 2,022, over there I run into Tony Lemus and

21  Mr. Roberto Savala, and they told me that some of the

22  people that I have invited, have invited some other

23  people, and that there was a bonus that I was not

24  getting because I had not realized that this was

25  going on.

                                                            77

1          So I asked him, "Okay, then, what do I
2   have to do?"  It had already gone since October of
3   2020 to January 2022, and they were paying me, so I
4   thought everything was fine.
5          So they came to my house and they
6   explained me what I have to do.  So they explained
7   me, and I started to get in touch with the people
8   that I had invited.  So that's when we started to go
9   on Mondays over there, and these people started
10  inviting some other people to come over here to these
11  meetings.  Everybody was going over there to do their
12  contracts.
13       Q.  (BY MR. GULDE)  Let me hit timeout for a
14  second.  You're saying "over there" and "here."
15          Are you talking about Mondays started --
16  Monday meetings started happening at the offices of
17  Aqua Rematch?
18       A.  No, it was at Blalock.  Right now I want
19  to do the link on how we end up in Aqua Rematch.
20       Q.  Okay.
21       A.  Uh-huh.  And people were not only coming
22  on Mondays, but during the weekdays people were
23  coming over there to do their contracts; and the same
24  people would tell the person that had invited them,
25  "I went over there to have a contract done," and

78

1    that's how the person would find out that somebody

2    had entered into a contract and that he or she was

3    going to receive a bonus.

4            But it kept on growing and then we

5    started having problems in the parking spaces of

6    Blalock.  So that's when we decided.  I spoke with

7    Ivonne, I said, "Why don't we help people" -- I was

8    already there -- "help people get their contracts

9    done over there and so they wouldn't have to go to

10   the other place."

11           When I said that there was an extra

12   bonus, that they talked to me and they told me that

13   there was an extra bonus for me, it's a bonus that is

14   different from the seven and the three.

15           Q.  Okay.

16           A.  But that bonus was not only for me but

17   for everybody else, so we decided to do it there.

18   And everybody was very happy because they didn't have

19   to fix the issues that we were having with the

20   parking at Blalock, and that's how it started to be

21   done at Office Park.

22           Q.  And when you say "Office Park," the Aqua

23   Remach office?

24           A.  Yes.

25           Q.  When was that?

79

1           A.   Now I do.

2           Q.   And so how did -- how did you get to --

3    on September 30th, this was a Friday?

4           A.   Because I have gone on Thursday to the

5    office.  Thursday, 28th?  Let me check.

6           Q.   Please check.  And Thursday was the 29th.

7           A.   I have been -- I have gone on the 28th.

8           Q.   Your calendar reflects that you went to

9    the Blalock office on the 28th?

10          A.   No, I'm just looking at what is the day

11   that I went.  Because I remember that day because

12   those were the last days that I was working with

13   there with them.  Uh-huh, yes, it was the 28th.

14          Q.   So as to this $3,300 and any other amount

15   that needed to be paid on the 30th, how did you store

16   that cash?

17          A.   I would leave that money over there in

18   the office.

19          Q.   Did you have a safe?

20          A.   Yes, I had a small safe that I had

21   bought.

22          Q.   Did you ever use paid security at Aqua

23   Rematch?

24               THE INTERPRETER:  Interpreter needs to

25   clarify.  The question is paid security?

                                                          113

1          Q.  And that's your signature as you normally

2    sign it on the bottom of Exhibit 16?

3          A.  Yes.

4                    (Exhibit 17 marked)

5          Q.  (BY MR. GULDE)  Now I'm handing you a set

6    of documents that's been labeled Exhibit 17.

7               MS. AGUILAR:  Can I take a picture of

8    this?

9               MR. GULDE:  Huh?

10              MS. AGUILAR:  Can I get a picture of it?

11              MR. GULDE:  Yes.

12         Q.  (BY MR. GULDE)  Can you identify the

13   documents that I have labeled Exhibit 17?

14         A.  Yes.

15         Q.  And I don't mind that you've taken the

16   staple off -- or the paperclip off, but would you

17   take care to keep them in order.

18         A.  Okay.

19         Q.  Are you able to identify this?  Do you

20   know what this is?

21         A.  Oh, yes.

22         Q.  Okay.  What is it?

23         A.  This is something that I did personally

24   when it was my time to pay a referral bonus, so I

25   could have evidence that I have paid the person.

                                                      115

1      Q.   Was it your idea to keep these receipts?

2      A.   Yes.

3      Q.   Are you aware of anyone else at CFX who

4   kept these receipts?

5      A.   No, I do not know really because this was

6   something that I did personally.

7      Q.   And this is part of a spiral bound --

8   well, it is the entire contents of a spiral bound

9   receipt notebook that you brought here today; is that

10  correct?

11     A.   No, I have one more.

12     Q.   You have another notebook like this?

13     A.   Yes, I can give it to her.

14     Q.   You didn't bring it today?

15     A.   No.  No, I thought that maybe one would

16  be enough.

17     Q.   Okay.  Definitely give it to your lawyer,

18  and we have already requested all documents that are

19  related in any way to CFX, so we view this as

20  responsive to that request.

21     A.   That's fine.

22          (Information to be supplied)

23     Q.   (BY MR. GULDE)  So this particular

24  notebook runs from February 21st, 2022 through

25  May 31st, 2022; is that right?

116

1          A.  Yes.

2          Q.  So those three months between February

3   and May, can we assume that your -- the other

4   notebook that you have covers three months as well?

5          A.  I am not sure, because I think I have

6   two -- I don't want to give dates, so I would rather

7   just give it to you.

8          Q.  Do any of these -- well, let's walk

9   through this.  Let's just look at the first receipt

10  in the notebook.  And that's from February 21st,

11  2022.  I think you might be looking at the wrong page

12  because you flipped a couple over.

13         A.  No.

14         Q.  Oh, okay, my mistake.  The very first one

15  is from CFX in the amount of $7,000, correct?

16         A.  Yes.

17         Q.  And does your name in the "From" space

18  indicate that you authorized the payment of $7,000?

19         A.  No.  What it says, that I paid that

20  amount; and if you can see here on the top, it says

21  "CFX," and then I would ask for the name of the

22  person and the signatures, but I wanted to keep some

23  evidence that had -- that I had issued that payment.

24         Q.  Who authorized the issue of this $7,000

25  payment?

                                                    117

1        A.   Since they do the contracts over there,

2   this person was due for his -- his referral bonus.

3   So the company would give me the money, and I wanted

4   to have a receipt because I had to match my numbers

5   with them, I have to present to them proof.

6        Q.   So other than giving you the money to pay

7   Mr. Hernandez in this case, did they give you a piece

8   of paper to indicate that he was owed a referral

9   bonus?

10       A.   No.   Because in the contract, the person

11  would do -- for example, in here, when you would see

12  here, you would already know who would take the first

13  bonus and who would take the second bonus.

14       Q.   So, for the record, you're pointing to

15  one of the contracts within Exhibit 15 that lists the

16  direct and indirect sponsors, right?

17       A.   Yes, those were the people that were

18  going to earn the money.

19       Q.   Whose job was it to make sure that they

20  kept track of all of those direct and indirect

21  sponsors in those lines on all of the CFX contracts?

22       A.   The person, the person that would bring

23  the referred individual would have to say, "This is

24  what I am owed."

25       Q.   Okay.   So in the case of this $7,000

                                                       118

1    payment in Exhibit 17, this would be Dorian

2    Hernandez's job to know that he is owed $7,000 in

3    this case?

4           A.   Yes.

5           Q.   And as the person who's going to hand him

6    that cash and give this receipt, would you review the

7    contracts to make sure he had done his math right?

8           A.   I would have to get a copy of the

9    contract.   I would have to take it to the office.

10   They would also check it, and then they would

11   authorize it.

12          Q.   Okay.   So if we're talking again about

13   this one, Dorian Hernandez would have come in to Aqua

14   Rematch sometime before February 21st, 2022 and tell

15   you that he expected a bonus payment of $7,000; is

16   that right?

17          A.   Yes.

18          Q.   And then you would -- he would come with

19   his contract.   Would you make a copy of that contract

20   at that time?

21          A.   Yes, and I take it to the office.

22          Q.   Okay.   Now, this writing on the side that

23   gives the contract number, does that indicate that

24   this is what he is owed as a bonus in connection with

25   a single contract?

119

1          A.   Yes.

2          Q.   And then what does "bono doble" mean?

3          A.   Okay.   There were sometimes that the

4    academy would make promotions for a week or a few

5    days, for example, to say, "From this date to this

6    date, we are going to give a double bonus."

7          Q.   So is there any way to know from this

8    document here in Exhibit 17 whether this represents a

9    direct or an indirect bonus?

10         A.   This is a direct bonus, because the only

11   double bonus was the direct.

12         Q.   Okay.   So does that mean that $7,000

13   represents 14 percent of Contract Number 16014?

14         A.   Yes.

15         Q.   Okay.   So that makes this contract a

16   $50,000 contract?

17         A.   Yes.

18         Q.   So is it your testimony that every single

19   receipt in here is only related to the payment of

20   bonus payments?

21         A.   Let me check.   Because sometimes when

22   they told me that I needed to pay the earnings, the

23   return for a person, that's when they need the

24   receipt.   And they should be here.   Let me check.

25              Okay.   Okay.   If you pass eight pages --

120

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

1          Q.  Can you give me the receipt number?

2          A.  It is not clear in here.  It is 1962 --

3          Q.  Uh-huh.

4          A.  -- 233.

5          Q.  Got it.

6          A.  Here it says -- in some of them it says

7     "referral bonus" and in some others it says "contract

8     payment."  This is one for 450 that was paid for this

9     person.  The second one in that page is the same, it

10    is a contract payment, 2,250; and then there is

11    another one, $7,200.  There are some that are

12    payments for contracts.

13          Q.  Why didn't you have receipts for all the

14    payments on contracts that you have made?

15          A.  Because I did this when the person would

16    come to the office -- to the office to collect the

17    money and they would not have their original with

18    them.  If they would have the original, then we would

19    do this; and if not, I would issue them a receipt.

20          Q.  Okay.  So you're indicating on

21    Exhibit 15, for the record, the packet of contracts

22    that if an investor had his contract, you would note

23    on the relevant month line how much money was being

24    paid pursuant to the contract; is that right?

25          A.  Yes.

121

1          Q.   And is that if someone came to Aqua

2  Rematch and did not have their contract, then that

3  would result in the creation of a receipt that's

4  reflected in Exhibit 17?

5          A.   Yes.

6          Q.   I thought you had testified earlier -- go

7  ahead.

8          A.   Sorry.  But I did that just because I

9  wanted to have an evidences that everything was

10  clean.

11          Q.   That you weren't taking the money for

12  yourself?

13          A.   Yes.

14          Q.   I thought you had testified earlier,

15  maybe I misunderstood, that you were not aware of

16  situations in which people had lost their contract?

17          A.   Yes.

18          Q.   Okay.  Does this reflect your -- does

19  this refresh your recollection about whether or not

20  that happened?

21          A.   No.  What happened is that when they

22  would come to the office, it is not that the

23  individual had lost their contract.  Sometimes they

24  would come from their office, from work, and they

25  didn't have the contract with them at the time, and I

122

1    would attempt to issue a receipt so you don't have to

2    come back.

3         Q.  I guess I'm still confused.  There are

4    situations where you would hand them a receipt but

5    not hand them money?

6         A.  No, no, I did.  I mean, if the person

7    would not bring that (indicates) original contract,

8    then I would -- what I would do was protect myself

9    showing that I have given them the money by doing a

10   receipt.

11        Q.  And did you ever end up seeing the

12   contract that they had left at work or whatever?

13        A.  What happens is that for them, many times

14   it was easier for them just to take a photo of the

15   contract and bring it like that.  That's why I would

16   know the contract number.

17        Q.  Would you ever create a receipt like this

18   and pay out money without at least a picture of the

19   contract?

20        A.  Yes.

21        Q.  Explain that.

22        A.  They would -- I mean, they would show me

23   the photo, and when I would take that to the office

24   and I would show this to them and they would see --

25        Q.  To the Blalock office?

123

1          A.   -- the contract number, they would find

2    it.

3               Yes.

4          Q.   But the money had already been paid out

5    at that point?

6          A.   Yes.   At the moment they would sign it

7    here, it was because I was handing them the money.

8          Q.   And just to be clear, did anyone ever

9    come in without even a picture of their contract and

10   get cash from you as reflected in one of these

11   receipts?

12         A.   No, I would not pay them.

13         Q.   Was there ever a situation where you took

14   one of these receipts and showed the Blalock people?

15         A.   Yes, when I would go over there to match

16   our numbers, I would say, "This is the amount of

17   money you gave me and here are the receipts," and

18   they would see.

19         Q.   It is something you did regularly?

20         A.   Yes.

21         Q.   Was there ever a time when you had to

22   claw money back because they disagreed?

23         A.   No.   Because we always know every time

24   you would make a contract, you will have the date and

25   the amount that they were going to collect.

124

1          Q.   And that was a record that they

2     maintained at Blalock as well?

3          A.   Yes.

4          Q.   Okay.   So just to make sure I have it

5     correct, the reason there are not many payments of

6     contract payments in here is because usually people

7     have their contracts with them and it has already

8     been cleared with Blalock?

9          A.   Yes.

10                    (Exhibit 18 marked)

11         Q.   (BY MR. GULDE)   Handing you what I've

12    marked Exhibit 18.

13         A.   Okay, something that I want to clarify:

14    I do not know if the other people would work like

15    that, this was my own work -- my own way to work.

16         Q.   And so when you're talking about "other

17    people," who are you talking about?

18         A.   I am talking about somebody else that

19    would have a different group, I don't know how they

20    would work.

21         Q.   Well, you know how they did things at

22    Blalock, right?

23         A.   Yes, yes.

24         Q.   Okay.   And did -- they did not do

25    receipts like this for bonus payments, did they?

                                                              125

1    and we are off the record.

2                    (Discussion off record)

3                    THE VIDEOGRAPHER:  The time is 4:52 p.m.,

4    and we are on the record.

5            Q.   (BY MR. GULDE)  Do you recognize what I

6    have labeled Exhibit 24?

7            A.   Yes.

8            Q.   And what is it?

9            A.   It is a text message that was posted in

10   the chat.

11           Q.   And by "the chat," do you mean -- is it a

12   WhatsApp chat?

13           A.   Yes.

14           Q.   And were the members CFX investors?

15           A.   Yes.

16           Q.   Had this chat existed before our lawsuit?

17           A.   Yes.

18           Q.   Do you know who wrote this particular

19   message?

20           A.   Yes.

21           Q.   Who was that?

22           A.   Okay, this message -- message does not

23   come directly from the academy.  When they say that

24   people could be helped, then I talked to my friend

25   Ena and together we created this message so that

                                                      153

1    people knew that it was no -- nothing personal of me,

2    but it was a message that we received from the

3    academy.  Because people were looking at me like I

4    was the responsible one.  People are looking at me

5    like I am the owner of the academy.

6            Q.  So you got together with -- with Ena and

7    wrote this?

8            A.  We talked on the phone and we put it

9    together.

10           Q.  Which one of you hit send?

11           A.  Well, since it is in the chat, we just

12   uploaded it there.

13           Q.  Who uploaded it, you or her?

14           A.  Well, we saw it, then I posted it.

15   Because people were pressuring me that they needed

16   information and I didn't have any other information

17   other than that.

18           MR. GULDE:  Okay.  Can I have the

19   translator go ahead and read it directly --

20           THE INTERPRETER:  Uh-huh.

21           MR. GULDE:  -- or translate it into

22   English.

23           THE INTERPRETER:  "Good night, family.

24   We apologize for the delay of the academy, trying to

25   look for a way to initiate your process in a safe and

                                                      154

1    be."

2            "Three, if you decide to stay in the

3    academy and you have not received a pending payment

4    or payable payment, please bring the copy of your AP

5    and a copy of the contract to initiate the process of

6    your payment.  The academy asked you that it is

7    important for all of us to collaborate in order to be

8    able to resolve this situation as quickly as

9    possible.  Remember, family, that the academy has not

10   closed.  Everything is normal and operating in other

11   cities and states."

12           "And, quote, this service will be

13   exclusively for the group of the Office Park Drive."

14           "Very good night and blessing."

15       Q. (BY MR. GULDE)  When you say, Mr. Turcios,

16   that everything is still normal and operating in

17   other cities and states, what basis did you have to

18   say that?

19       A.  Well, based on the information provided

20   to us by the academy, like that Chicago was

21   operating, that California was operating, and I just

22   transmitted that information.

23       Q.  Who at the academy was telling you that

24   other cities were operating?

25           A.  It was something from the academy, we

                                                    156

1    were called.

2              Q.   You were called?

3              A.   Yes.

4              Q.   And you spoke to a human being?

5              A.   Yes, yes.

6              Q.   Who was it?

7              A.   The person that called me that day to

8    give me that information was Nancy that I spoke to.

9              Q.   Did you gave us Nancy's phone number

10   before?  Do you have it?

11             A.   I think so.

12             Q.   And do you know Nancy's last name?

13             A.   No.  346-577-6786.

14             Q.   So your testimony is that in October,

15   Nancy, the same person who would later give you

16   $38,000 after you called Mauricio, called you and

17   said that CFX is not closed and that everything is

18   still normal and operating in other cities and

19   states?

20             A.   She said that they were working in those

21   states, yes.

22             Q.   And that CFX had not closed?

23             A.   No.  That it was a civil lawsuit and that

24   it was a process, that was it.

25             Q.   What else did Nancy say in this

                                                          157

1  conversation?

2       A.   No, it was brief.

3       Q.   Well, she said that it's a -- the lawsuit

4  is just a civil case and that the company is still

5  operating in other cities and states.

6            Did she say anything else?

7       A.   No, that the lawsuit was going to be

8  resolved.

9       Q.   Did she say anything about Mauricio?

10      A.   No.

11      Q.   Did you understand that this information

12  came from Mauricio?

13      A.   Yes.

14      Q.   And why did you understand that?

15      A.   Because I believe that Nancy's not going

16  to come up with anything, that's all.

17      Q.   Was that your experience with her role in

18  the past?

19      A.   Yes.

20      Q.   Now, this idea in the numbered paragraphs

21  that you guys gave to investors, that people would

22  not be able to obtain interest if they decided to

23  leave the academy, who came up with that?

24      A.   That is information that I received from

25  Mauricio.

158

1          Q.   When did Mauricio tell you this?

2          A.   It was a brief call.   In those calls that

3   I was making to him after everything happened, we

4   talked about that.

5          Q.   Let's look at paragraph number two.

6               When you told people to come with printed

7   copies of their contracts, you told them that you

8   would be telling them how -- how the cash payments

9   would be handled; is that right?

10         A.   No.   What it says here is we are going to

11   be communicating how the reimbursements of the

12   capital are going to be, but I have no idea.

13         Q.   Okay.   At that point, did you know how

14   the reimbursements would happen?

15         A.   No.   No.

16         Q.   Did Mauricio give you any idea about how

17   reimbursements might happen?

18         A.   No, he didn't neither.

19         Q.   And then similarly with the next

20   paragraph, when you tell people that they can start

21   their payment process, did you have any idea how that

22   payment process would start?

23         A.   No, I didn't know.

24         Q.   Did you run any of this by Mauricio

25   before you sent it?

159

1      A.  No.  No, because it was just based on the
2  conversation that I had with him, and I sent it to
3  the people.
4           MS. AGUILAR:  Can we go off the record
5  for a minute?
6           MR. GULDE:  Sure.
7           THE VIDEOGRAPHER:  The time is 5:07 p.m.,
8  and we are off the record.
9              (Discussion off record)
10           THE VIDEOGRAPHER:  The time is 5:08 p.m.,
11  and we are on the record.
12      Q.  (BY MR. GULDE)  Did you discuss that with
13  Carmen and Rossy?
14      A.  Not really with Rossy.  Because Rossy was
15  very affected by this issue.  I think she needed
16  medical intervention because she had an anxiety
17  problem.
18      Q.  Has she been involved in any discussions
19  since October?
20      A.  No, she -- immediately given her
21  situation, she withdraw from the issue and she sent
22  me a text saying she is still sick.
23              (Exhibit 25 marked)
24      Q.  (BY MR. GULDE)  I am going to hand you a
25  photograph that's been labeled Exhibit 25.  Can you

160

1                     (Discussion off record)

2                THE VIDEOGRAPHER:  The time is 6:05 p.m.,

3    and we are on the record.

4          Q.  (BY MS. THEMELI)  Mr. Turcios, are you

5    aware of any person who has or may possess

6    information regarding receivership assets, and by

7    that I mean assets that you think belong to Mauricio

8    Chavez or CFX, including documents or records?

9          A.  No, I know nothing.

10         Q.  Did you know where Mauricio lives?

11         A.  Not at all.

12              MS. THEMELI:  Thank you.  I don't have

13   any other questions.

14              MR. FLACK:  I have got just a few, but I

15   need somebody's microphone.

16              THE VIDEOGRAPHER:  Pass him a microphone.

17                     EXAMINATION

18         Q.  (BY MR. FLACK)  Mr. Turcios, my name is

19   Paul Flack, and I represent Mauricio Chavez; and let

20   me say, first of all, I'm very sorry to hear about

21   the threats and the other bad things that happened to

22   you in connection with CFX, and I appreciate your

23   being here this evening.

24         A.  Thank you.

25         Q.  Well, let me ask you first with respect

                                                    187

1  to -- you talked about a call you had with Mr. Chavez

2  regarding a threat with Ms. de la Cruz, correct?

3          A.  Yes.

4          Q.  In that call, did Mr. Chavez mention to

5  you that he had also received threats in connection

6  with CFX?

7          A.  Yeah, he told me that he had been

8  threatened.

9          Q.  Okay.  Have you ever met or communicated

10  with Eduardo Taffinder?

11          A.  No.  Are you talking about father or son?

12          Q.  Well, let's start with the father.

13          A.  I saw him the very first time I went, but

14  I never had communication with him, and I know that

15  he died.

16          Q.  Okay.  What about the son?

17          A.  I haven't had communication with him.  I

18  saw him several times in there and I just said

19  "hello."

20          Q.  Okay.  What about Gustavo Gomez, have you

21  ever communicated with him?

22          A.  No.

23          Q.  Do you ever see him?

24          A.  When I first arrived in October, somebody

25  pointed out "that this was Gustavo."  I don't know

188

1    STATE OF TEXAS

2    COUNTY OF HARRIS

3

4                  REPORTER'S CERTIFICATE

5              ORAL VIDEOTAPED DEPOSITION OF

6               MR. ORLIN W. TURCIOS-CASTRO

7                   December 8, 2022

8

9           I, Michelle Hartman, the undersigned

10   Certified Shorthand Reporter in and for the State of

11   Texas and Registered Professional Reporter, certify

12   that the facts stated in the foregoing pages are true

13   and correct.

14           I further certify that I am neither

15   attorney or counsel for, related to, nor employed by

16   any parties to the action in which this testimony is

17   taken and, further, that I am not a relative or

18   employee of any counsel employed by the parties

19   hereto or financially interested in the action.

20

21

22

23

24

25

1          SUBSCRIBED AND SWORN TO under my hand and

2     seal of office on this 13th    day of December, 2022.

3

4

5     _____

6          Michelle Hartman, CSR, RPR

      Texas CSR 7093

7     Expiration:  12/31/23

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25