IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, § § § § Plaintiff, § § v. § § MAURICIO CHAVEZ, § GIORGIO BENVENUTO, and § CRYPTOFX, LLC, § § Defendants, § § and § § CBT GROUP, LLC, § § Relief Defendant. § | CIVIL ACTION No. 4:22-cv-03359  JUDGE ANDREW S. HANEN |

**SUR-REPLY IN OPPOSITION TO RECEIVER'S MOTION FOR AN ORDER TO SHOW CAUSE WHY DEFENDANT MAURICIO CHAVEZ SHOULD NOT BE HELD IN CIVIL CONTEMPT FOR FAILING TO COMPLY WITH THIS COURT'S ORDER APPOINTING RECEIVER**

Defendant Mauricio Chavez provides this sur-reply in opposition to the Receiver's Motion for an Order to Show Cause Why Defendant Mauricio Chavez Should not be Held in Contempt for Failing to Comply with this Court's Order Appointing Receiver [ECF No. 39] ("Receiver's Motion") and the Receiver's Reply in support of that Motion [ECF No. 49] ("Receiver's Reply") and would respectfully show the Court as follows.

I.   **Response to Receiver's Reply**

   A.   **The Classes Were Real.**

The Receiver's Reply does not contest many of the key points of Chavez's opposition to the Receiver's Motion [ECF No. 45]. The Receiver does not contest that the classes offered by

1

CFX were real, nor does the Receiver dispute any of the testimony from witnesses subpoenaed by the SEC establishing that the classes were not a mere pretext, that the students learned how to open wallets and trade cryptocurrency, and that after CFX was closed "some students were concerned about the – the classes."[1] Teaching people things like that is not the sale of a security and it violated no law.[2] So, while the SEC and the Receiver may take great issue with some aspects of CryptoFX's business, CryptoFX also had other functions that were not even allegedly unlawful but that were also shut down and subjected to the asset freeze and the order appointing the Receiver.

**B.   Mr. Chavez had Accepted No Funds and Taught no Classes Since his Current Counsel Entered the Case.**

The Receiver claims that, "Chavez and persons associated with him, including Juan Puac, continued to operate schemes."[3] To be clear, the undersigned does not claim that Mr. Chavez strictly complied with the Court's orders prior to his counsel's entry into this case on December 2, 2022. But it is the undersigned's understanding that Mr. Chavez has not been involved in the receipt of any funds from students or participants since counsel entered this case. Indeed, even though the teaching of classes was never illegal, Mr. Chavez has not even taught any classes since his current counsel entered this case. Other people who were affiliated with CryptoFX may, in fact, be continuing to teach classes or accepting funds, but Mr. Chavez is not involved in any such activity.

**C.   CryptoFX Lacked Anything Approaching Adequate Management and Accounting Systems.**

The Receiver appears to take issue with the statement in Chavez's Opposition that

---

[1] See Response to Receiver's Motion for an Order to Show Cause Why Defendant Mauricio Chavez Should not be Held in Civil Contempt for Failing to Comply with this Court's Order Appointing Receiver ("Opposition" or "Chavez's Opposition") [ECF No. 45] at pp. 3-4.
[2] It is not clear that the SEC has any authority to regulate cryptocurrency and, even if it does, the teaching of classes about cryptocurrency would still not be in its purview and the First Amendment would protect the teaching of classes. See Lowe v. SEC, 472 U.S. 181, (1985) and 15 U.S.C. § 80b-2(11).
[3] Receiver's Reply [ECF No. 49] at p. 3.

"CryptoFX's operations had no real management structure and almost no systems or formal procedures."[4] The Receiver argues that "the company had a "referral scheme," an "accounting department," and "spreadsheets."[5] But, again, Chavez never contested that there were some procedures and some effort to track funds. As Chavez stated in his Opposition, "The firm had a few people assigned to bookkeeping and some of them apparently made spreadsheets and some effort to track transaction, but the business lacked any central or effective method of tracking how much it was taking in and how much it planned to try to pay out."[6] The Receiver does not contest the testimony, much of which was elicited by the Receiver, regarding the mostly cash transactions, handwritten forms,[7] personal safes, personal spiral-bound receipt books, and lack of an IT department (or IT person), or even work schedules for those taking in and paying out funds.[8] The Receiver (who has more commercial experience than Mr. Chavez) and his obviously competent counsel have been looking at the company's books and bank accounts with the assistance of financial experts from a "nationally-recognized leader in working with distressed and insolvent businesses"[9] and they appear to agree with Chavez. The Receiver wrote in his most recent interim report, "To date, the Receiver has not located a set of books and records that tracked CryptoFX's cash, banking, investments and investor activity"[10] and that "the transactions are scattered among various reports."[11] The Receiver foreshadows that "a complete tracing of investments may not [be] possible and/or practical."[12] And, of course, Mr. Chavez (whom the SEC alleges ""has no

---

[4] Receiver's Reply [ECF No. 49] at p. 2, note 1.
[5] Receiver's Reply [ECF No. 49] at p. 2, note 1.
[6] Chavez's Opposition [ECF No. 45] at p. 9.
[7] Chavez's Opposition [ECF No. 45] referred to the handwritten carbon paper forms as single-page. It appears that at least some of the forms were actually two pages.
[8] See Chavez's Opposition [ECF No. 45] at pp. 6-7.
[9] https://haysconsulting.net/.
[10] Receiver's Second Interim Report [ECF No. 50] at p. 13.
[11] Receiver's Second Interim Report [ECF No. 50] at pp. 13-14.
[12] Receiver's Second Interim Report at p. 13.

known background, education, or training in trading [or] investment management")[13] never had any "nationally recognized" financial experts assisting him. Mr. Chavez's point stands that after the exponential growth of the business from cryptomania and the departure of one of CryptoFX's founders and the death of the other, who was – "the guy that kind of held it together"[14] – Mr. Chavez inherited a task he was ill-equipped to handle.

### D. Mr. Chavez Does not Have anything Like the Funds the Receiver Claims.

Despite admitting to the extremely imperfect nature of the financial accounting systems and records at CFX, the Receiver still boldly asserts that there was "$41 million in cash delivered to Mr. Chavez" "from November 1, 2021 to September 28, 2022."[15] To be very clear, Mr. Chavez does not have and has never had $41 million. The pictures that the Receiver attaches to his motion and that he describes as "show[ing] Chavez counting cash the night before the Receiver was appointed" also show Mr. Chavez leaving the office with one of the CFX Leaders and Mr. Chavez gave substantial sums of cash to that leader to satisfy contracts of participants.[16] Mr. Chavez has only a small amount of cash that he has been living on and he is prepared to turn that over once he has been able to reach agreement with the Receiver on an allowance.

The Receiver's expert's analysis is based on the assumption that every entry on some daily report that says "Entrega Cash" [Delivered Cash] (even if they do not say delivered to "Mauricio" or to "Chavez") means that the amount indicated was delivered to Mr. Chavez. The Receiver has cited no testimony or evidence for that. It appears to be based upon the Receiver's expert's unexplained and unattributed "understanding."[17] This is flawed in several respects. But even if

---

[13] SEC's Complaint [ECF No. 3] ¶ 7.
[14] Ex. 2 to Chavez's Opposition [ECF No. 45] [Benvenuto Dep. Tr.] 120:5 – 120:10.
[15] Receiver's Second Interim Report [ECF No. 50] Ex. A.
[16] Receiver's Reply [ECF No. 49] at 2 and Receiver's Motion [ECF No. 39] Ex. A at p. 5.
[17] Receiver's Second Interim Report [ECF No. 50-1] Ex. A ¶ 8. See also, Chavez's Opposition [ECF No. 45] at p. 19.

that assumption was close to correct, the suggestion that Mr. Chavez had that much money is flawed in at least two additional ways.

First, this analysis appears to ignore the testimony that Mr. Chavez also sent funds to others that were used to pay students their returns.[18] And, of course, referral fees also had to be paid to those people who introduced others to CryptoFX, and the Receiver admits that the Receiver lacks "complete information" regarding those payments.[19]

Second, at least three of the witnesses the SEC has subpoenaed so far have questioned entries on CryptoFX reports that said that they received payments. One said that she did not receive an amount that the report said was "Entrego" to her name on September 22, 2022. "I wasn't given anything on that date, no."[20] She said it might have actually been an amount she *delivered to* CryptoFX.[21] Another witness also said he did not remember ever receiving an amount that another daily report indicated he had received.[22] He too said that the amount might have actually been for contracts he delivered to CryptoFX.[23] Still another testified that a page titled "Pagos Hechos 2/20/2022" (payments made 2/20/2022) was probably actually reflecting checks he had received months earlier.[24] And, at CryptoFX, daily apparently did not always mean daily. It was apparently "normal" for a CryptoFX report that referenced a single date to actually cover "one, two, maybe three days."[25]

---

[18] See, e.g., Ex. 1 [Taffinder Dep. Tr.] 33:20 – 34:14.
[19] Receiver's Second Interim Report [ECF No. 50-2] Ex. B at p. 4.
[20] Ex. 2 [Saravia Dep. Tr.] 195:5 – 196:5 and Ex. 3 [Dep. Ex. 58].
[21] Ex. 2 [Saravia Dep. Tr.] 195:5 – 196:5 and Ex. 3 [Dep. Ex. 58].
[22] Ex. 4 [Lemus Dep. Tr.] 88:4 – 90:14.
[23] Ex. 4 [Lemus Dep. Tr.] 88:4 – 90:14.
[24] Ex. 1 [Taffinder Dep. Tr.] 349:17 – 353:13.
[25] Ex. 2 [Saravia Dep. Tr.] 138:24 – 139:25.

CryptoFX promised, ***and paid***, handsome returns even while the cryptocurrency market was collapsing. By the Receiver's own account the payouts continued, to at least some participants, even after the freeze order.[26] It is not hard to imagine where the funds went.

### E. The Cars

The Receiver complains about having received only one car from Mr. Chavez and about Mr. Chavez's failing to "ma[ke] the BMW available for inspection by the Receiver team, despite several requests for same."[27] Again, the undersigned cannot speak to what may have been requested prior to his entry in the case, but since that time two months ago, the undersigned has never received any request from the Receiver to inspect any car and the undersigned has corresponded and spoken with the Receiver's counsel about the BMW on several occasions. Nevertheless, upon seeing the Receiver's reply claiming that the Receiver wanted to inspect the BMW, the undersigned made it available. But then the Receiver agreed to a proposal that Mr. Chavez return the BMW and drive the Lexus instead and Mr. Chavez returned the BMW the very next day. The Lexus (which had previously been in the possession of Ms. Gonzalez) is now the only car Mr. Chavez has. The Receiver has said that he wants Mr. Chavez to also return a Volkswagen Tiguan that is apparently titled in his name, but Mr. Chavez does not have possession of the car or keys to it. Both are in the possession of his estranged wife. The Receiver says that she was not cooperating in returning that car, so the undersigned wrote to the Receiver and the counsel for Mr. Chavez's estranged wife: "I understand that the Receiver wants to take possession of a VW Tiguan that is in the possession of Ms. Vargas. My client is fine with the Receiver taking possession of that car. If your client objects to that, please let me know. If she does not, please

---

[26] Receiver's Motion [ECF No. 39] ¶ 16.
[27] Receiver's Reply [ECF No. 49] at 4.

6

let me know that too, and let me know if there is anything we need to do to facilitate its delivery to the Receiver (ccd above)."[28]

### F. Mr. Chavez's Constitutional Rights

The Receiver also complains of Mr. Chavez's assertion of his rights under the Fourth and Fifth Amendments to the US Constitution regarding turning over a computer and a cell phone.[29] Mr. Chavez's assertion of his constitutional rights, including the act of production privilege is appropriate and it is most assuredly not any basis to hold him in contempt.

The Receiver states that he owns the attorney-client privilege of CryptFX and CBT.[30] Mr. Chavez is not attempting to assert any attorney-client privilege of the companies. He is only asserting his own attorney-client privilege and the Court was clear that he retained ownership of his personal privileges.[31]

The Receiver argues that the Fifth Amendment does not apply to turning over the devices because any testimonial aspect of that act is "a 'foregone conclusion."[32] The Receiver replies principally on *In re Grand Jury Subpoena*, 670 F.3d 1335 (11th Cir. 2012), but in that leading case the Eleventh Circuit found that "the decryption and production of the hard drives would require the use of the contents of [the Defendant's] mind and could not be fairly characterized as a physical act that would be nontestimonial in nature." 670 F.3d at 1346. The court also rejected the application of the foregone conclusion doctrine because the government could not show that it

---

[28] Ex. 5.
[29] Two cell phones and a laptop Mr. Chavez used prior to, and after, the Receiver's appointment have been placed in the custody of a forensic computer specialist. Mr. Chavez also has a phone that he obtained recently (and to which he transferred his sim card) and a laptop that he did not use for anything but a zoom deposition with the SEC. He uses those two devices to communicate with his current counsel.
[30] Receiver's Reply [ECF No. 49] at p. 6.
[31] Order Appointing Receiver [ECF No. 011] ¶ 7L (The Receiver "shall not have the power to waive the Fifth Amendment rights of the individual defendants; nor can he compel a waiver of their attorney-client privilege."); September 29, 2022 Hearing Transcript at p. 16 ("The receiver can't waive the privilege either. . . I think he would know that instinctively, but if he didn't, I'm saying it now.").
[32] Receiver's Reply [ECF No. 49] at p. 9.

knew with any specificity what was on the hard drives. 670 F.3d at 1347. In doing so, the court quoted the Supreme Court's holding in *United States v. Hubbell*, 530 U.S. 27 (2000) that the government would have to show it knew of the existence and location of the files it seeks and that "[t]he Government cannot cure this deficiency through the overbroad argument that a businessman like respondent will always possess general business and tax records that fall within broad categories described in this subpoena." 670 U.S. at 1345. The Receiver here is similarly seeking turnover and unlocking of devices based on the broad assertion that they contain some unspecified "business records."[33]

The Receiver also relies upon this Court's own opinion in *United States v. Cheng*, 2022 WL 112025 (S.D.Tex. 2022). But the situation in *Cheng* was far different than the scenario now before the Court. Mr. Cheng was a defendant in a criminal case where the Court was considering a motion to suppress under the exclusionary rule. Mr. Cheng had already produced the devices and their passwords to the government, *Id.* at *6. The Court found that Cheng had engaged in an act of production and that his Fifth Amendment rights were violated, but denied the motion to suppress because it found that the discovery of the information was "inevitable." *Id.* at *9. In reaching that conclusion, the Court considered such facts as that an arrest warrant had already been issued for Mr. Cheng, the government was already aware of certain contents that would be on the devices, the agents had obtained a search warrant prior to searching the devices, and Mr. Cheng did not challenge the validity of that warrant. *Id.* at *2, *4 and *8 n.12.[34] Here, there has been no

---

[33] Receiver's Reply [ECF No. 49] at p. 6.
[34] *See also, Hoffman v. United States*, 341 U.S. 479, 486 (1951) (Fifth Amendment privilege extends not only to incriminating evidence, "but likewise embraces those which would furnish a link in the chain of evidence.")

arrest and no search warrant and no showing that would justify disregarding Mr. Chavez's Fourth and Fifth Amendment rights.[35]

## II. Conclusion

Mr. Chavez has been cooperating with the Receiver. He has:

- Toured the facility and explained its operations to the Receiver;

- Turned over two cars to the Receiver, one a fully paid for Mercedes the Receiver's agent has posted for sale for $76,995, and the other a BMW turned over just last week, and he has directed his wife's counsel to turn over a third;

- Tendered to the Receiver $55,000 in cash;

- His former and current counsel have turned over more than $370,000 of retainers they had;

- Taken down web sites at the Receiver's and the SEC's request;

- Opened his home to the Receiver, the Receiver's counsel, and an appraiser and let them spend two hours looking in every drawer, cabinet, and laundry hamper in his personal residence;

- Scheduled with the Receiver an inspection of a vacant house Mr. Chavez purchased.

And, Mr. Chavez has not asserted a single objection to any of the more than 35 subpoenas the SEC and the Receiver have issued, including those to financial institutions where Mr. Chavez had personal bank accounts.

At least since the undersigned counsel came in this case two months ago, Mr. Chavez has not taken any funds from any student or even attempted to hold any classes regarding cryptocurrency. Mr. Chavez has asserted his Fifth (and Fourth) Amendment rights, but that is certainly no reason to hold him in contempt.

---

[35] Regarding the security system at the Blalock office, the password was created by the person who installed the system. Mr. Chavez provided the Receiver with that person's name and number and the password when the Receiver came to that office with Mr. Chavez.

Extraordinary remedies for contempt should "be imposed only where violations have been flagrant and lesser remedies appear to fail." *NLRB v. Trailways, Inc.,* 729 F.2d 1013, 1023 (5th Cir. 1984). ("The sanctions imposed are to be remedial or coercive but not penal and are to be adapted to the particular circumstances of each case.").

For the reasons stated above, the Receiver's motion should be denied.

Respectfully submitted,

By: */s/ Paul D. Flack*
Paul D. Flack
TBA # 00786930
SD Texas ID No. 17461
pflack@prattflack.com
Pratt & Flack, LLP
4306 Yoakum Blvd., Suite 500
Houston, TX 77006
(713) 705-3087

**Counsel for Defendant Mauricio Chavez**

### CERTIFICATE OF SERVICE

I hereby certify that the foregoing document was served on all counsel of record via the Court's CM/ECF electronic service of process on or before February 6, 2023.

_____
Paul D. Flack