**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | § | |
| **Plaintiff,** | § | |
| | § | **CIVIL ACTION No. 4:22-cv-03359** |
| **v.** | § | |
| **MAURICIO CHAVEZ, GIORGIO BENVENUTO, and CRYPTOFX, LLC,** | § | **JUDGE ANDREW S. HANEN** |
| **Defendants,** | § | |
| **and** | § | |
| **CBT GROUP, LLC,** | § | |
| **Relief Defendant.** | § | |

**<u>CHAVEZ'S RESPONSE TO RECEIVER'S MOTION TO COMPEL</u>**

# Table of Contents


Table of Authorities……………………………………………………………………iii

I. Introduction and Summary of Argument .......... 1

II. Factual Background .......... 1

A. CryptoFX .......... 1

B. CryptoFX's Classes .......... 2

C. CryptoFX's Returns were far Below What Crypto was Offering .......... 3

D. CryptoFX Grew Beyond Its, or Mr. Chavez's, Management Capabilities. .......... 4

E. The Candid Texts and Mr. Chavez's Investments Belie Any Claim of Fraud. .......... 7

F. Mr. Chavez is not Trying to Impede the Receiver. .......... 8

III. Argument and Authorities .......... 8

A. Mr. Chavez's Constitutional Rights .......... 8

B. Some of the Receiver's Claims about the Devices and Passwords are not Correct .......... 10

C. The Receiver Has Not Described the Materials Sought with the Particularity Required for the Foregone Conclusion Exception. .......... 11

D. The Devices Likely Contain Attorney-Client Privileged Material. .......... 13

E. The Records of Other Business Entities. .......... 14

IV. Conclusion .......... 14

## Table of Authorities

**Cases**

*United States v Apple MacPro* Computer, 851 F.3d 238, 248-49 (3d Cir. 2017)......... 9, 11, 12, 13

*Fisher v. United States*, 425 U.S. 391 .......................................................................................... 9

*In re Grand Jury Subpoena*, 670 F.3d 1335, 1346 (11th Cir. 2012) ..................................... 11, 12

*United States v. Cheng*, 2022 WL 112025 (S.D.Tex. 2022)........................................................ 12

*United States v. Hubbell*, 530 U.S. 27 (2000)................................................................... 11

Mauricio Chavez responds to the Receiver's Motion to Compel Chavez to turn over certain records and electronic devices (ECF No. 71) and would respectfully show the Court as follows.

## I. Introduction and Summary of Argument

The Receiver seeks to compel the production of Mr. Chavez's personal electronic devices[1] and documents relating to other business entities Mr. Chavez established on LegalZoom. The electronic devices containing Mr. Chavez's personal information and production of them are protected by the Fourth and Fifth Amendments and the attorney-client privilege. With respect to the other businesses, they have no offices or employees and the Receiver already has the few records Mr. Chavez had for those companies.

## II. Factual Background

A lot of people lost their hard-earned money in CryptFX. As with most tragedies, it had multiple causes, including the public mania for crypto, the uncontrolled and unmanageable growth of CryptoFX, the untimely rupture of a friendship, and the tragic death from Covid of one of CryptoFX's founders. But, contrary to what some have suggested, it was not caused by any desire by Mauricio Chavez to defraud or hurt anyone. Mauricio Chavez believed in CryptoFX and he feels horrible for all who have lost money in its collapse.

### A. CryptoFX

Mr. Chavez started trading cryptocurrency for his own account in 2015 at the age of 36. People he knew asked him if he could show them how to buy Crypto and that grew into him giving seminars at Denny's restaurants explaining to people how they could open a bitcoin wallet and trade and invest. As part of those classes, he would sometimes conduct live trades using his own bitcoin wallet. Those trades were often profitable. When the students saw this, they started asking

[1] Since December 28, 2022, the devices have been in the safekeeping of a forensic computer expert, who has been ordered to preserve them in accordance with this Court's order.

if they could just give him money to trade for them.

In early 2020, Mr. Chavez started CryptoFX along with Eduardo Taffinder and Gustavo Gomez. With CryptoFX, in exchange for a payment, students gained access to classes on how to trade crypto or forex and the chance for a return on what they had paid. This was recorded in single-page carbon paper forms they called a "Venture Agreement," that had only the barest of terms. The forms had handwritten in the student's name, the amount they were contributing and whether they wanted their potential reward monthly, every three months, or six months. The papers show generous potential returns that varied but were most often 15% per month.[2]

The forms they used included strong disclaimers warning of the risks involved, including, for example, that crypto is "VERY SPECULATIVE AND RISKY," that "CRYPTOFX LLC IS A SIMPLE EDUCATIONAL ACADEMY," that it is "NOT REGISTERED" with the "SECURITY AND EXCHANGE COMMISSION AS A DEALER OR AS AN AGENT," and that that "THERE IS NO INVESTMENT PLAN."[3] Testimony has confirmed that the students were told and understood that "they could get 15 percent or they might get zero."[4]

**B. CryptoFX's Classes**

While the Receiver argues that "attendance at the classes was 'optional' and "[m]any of the presentations were promotional in nature," the classes were not some pretext to solicit financial participation, they were real. CryptoFX had classes six days a week during the day and Zoom classes in the evening.[5] They even taught classes in the early morning and at 10 pm, so the students could see live trades on various markets.[6] One teacher testified that there were six teachers and he

[2] Ex. 25.
[3] Ex. 25.
[4] Ex. 1 ("Saravia Tr.") 218:16 to 218:24; Ex. 5 ("Gonzalez Tr.") 254:9 – 257:17.
[5] Ex. 2 ("Benvenuto Tr.") 30:25 – 33:22.
[6] Benvenuto Tr. 30:25 – 33:22.

said students found his classes "valuable."[7] One student who was deposed explained that she "took a lot of classes" and "learned to open bitcoin wallets" and to "buy and sell bitcoin."[8] Another testified she attended a forex class and three one-and-a-half hour-long crypto classes."[9] Mr. Benvenuto testified that the classes covered various topics like Ethereum and Shiba and "how do you set up a virtual wallet."[10] He did not recall "a pitch for investment or trading with CryptoFX . . . being part of the classes."[11] "[I]t was a true learning experience."[12] After the Receiver shut down the CryptoFX office, some people wanted their money back, but "[s]ome people were concerned about the – the classes."[13]

### C. CryptoFX's Returns were far Below What Crypto was Offering.

The 15%, or in some cases 20%, potential returns referenced in CFX's venture agreements may look generous in hindsight, but they looked skinny at the time given what was happening in the crypto market. In the 20 months from March 2020 to November 2021, bitcoin's price went up 1,125%. It was not unreasonable for Mr. Chavez and the others at CryptoFX to believe they could provide the referenced returns. Crypto had been soaring and many sophisticated financial voices were sure it was just the beginning. People were getting rich investing and trading in crypto. One witness testified that Mr. Chavez once told him he had made $50,000 in five minutes and then showed him the transaction on his phone.[14] Texts that a CryptoFX forex trader sent to Mr. Chavez

---

[7] Ex. 3 ("Taffinder Tr.") 369:2 to 370:23; Gonzalez Tr. 257:18 – 258:12 (Saw "a lot of people there . . . attending classes" and heard people "speak positively about learning a lot.")
[8] Saravia Tr. 218:25 - 219:3.
[9] Ex. 4 ("De La Cruz Tr.") 22:13 to 23:2; see also Taffinder Tr.54:7 to 55:3 ("she had a lot of knowledge.").
[10] Benvenuto Tr. 32:23 – 33:22.
[11] Benvenuto Tr. 32:13-32:22.
[12] Benvenuto Tr. 32:13-32:22.
[13] Taffinder Tr. 36:1 – 36:6.
[14] Taffinder Tr. 111:21 – 112:20.

include statements like, "24 hours back in the market and we have done 27% not bad," "$1.5M [profit] this week," "2.2 this week brother," and a profit of "2,120,000.00" over two days.[15]

### D. CryptoFX Grew Beyond Its, or Mr. Chavez's, Management Capabilities.

The soaring values for crypto fed public obsession. It seemed everyone wanted in and word of mouth spread that CFX was a way to get in. The CFX "office" grew from a few guys working at a table at Panera Bread and teaching classes in a motel conference room to having an office where "building management threaten[ed] to cancel CryptoFX's lease as a result of too much uncontrolled foot traffic caused by the increased business."[16] CFX moved to a much larger space but even there parking was still a problem.[17]

Mauricio Chavez's role was to trade crypto (and to some degree forex).[18] The administration of the office was more the role of Gustavo Gomez and Eduardo Taffinder. Mr. Taffinder "primarily, he handled more of the day-to-day -well, what I would – it appeared to me he handled the day-to-day operations of that business."[19] "Eduardo [Taffinder] ran the office environment; Mauricio ran the trading as it were; and I understood that Gustavo [Gomez], I guess handled the education piece, slash, the crypto trading as well."[20] But in the first half of 2021, Mr. Chavez and Mr. Gomez had a falling out and Mr. Gomez left the firm, which left only Mr. Taffinder to handle the administration of the business.[21] But then a few months later, tragically Mr. Taffinder - "the guy that kind of held it together,[22] - contracted COVID and fell into a coma and died.[23] So Mr. Chavez was left alone with a management nightmare for which he was terribly

[15] Ex. 7 (excerpts).
[16] Benvenuto Tr. 88:13 – 88:24 and 49:25 – 52:16.
[17] Ex. 6 ("Turcios Tr.") 78:20 – 79:14.
[18] Benvenuto Tr. 28 (Chavez "was the main trader at that point because he didn't actually do any teaching.")
[19] Benvenuto Tr. 27-28.
[20] Benvenuto Tr. 51.
[21] Ex. 5 ("Gonzalez Tr.") 260:8 – 261:9.
[22] Benvenuto Tr. 120:5 – 120:10.
[23] Gonzalez Tr. 260:8 – 261:9.

ill-suited.

CryptoFX's operation had no real management structure and almost no systems or formal procedures. CryptoFX was taking in and paying out ever growing sums – mostly in cash - and its primary record-keeping method was still the single-page carbon paper forms that were filled in by hand when money was received and then annotated - again in handwriting - when funds were paid out. The business was understaffed. "I will take anybody you throw at us but we need more admin help."[24] The firm had a few people assigned to bookkeeping and some of them apparently made spreadsheets and some effort to track transactions, but the business lacked any central or effective method of tracking how much it was taking in and how much it planned to try to pay out. It had no CPA, no HR program (the late Mr. Taffinder had handled that), and no real CRM system. Because the company had "crypto" and "FX" (a/k/a foreign exchange) in its name, it could not even keep a bank account. It had to change banks at least three times.[25] As the Receiver notes, the business did not even "send investors any type of statement."[26] The people assigned to receive and pay out all this cash to investors kept their own ad hoc records, like spiral notebooks, that they kept in their own possession.[27] At least two of those people kept their own safes to store cash.[28] The people who would receive and pay out all this cash did not even have set hours. "Yes, we didn't have a schedule."[29]

CFX had no IT department, or even an IT person. One of the crypto teachers explained that if people had IT problems, and he happened to be at the office, "[p]eople would ask me for

[24] Ex. 8.
[25] Benvenuto Tr. 112:6 – 112:15.
[26] Receiver's Motion to Compel [ECF No. 3] at p. 4.
[27] Turcios Tr. 116:3 - 116:20.
[28] Turcios Tr. 113:19 – 113:21; Saravia Tr. 197:8 - 198:16.
[29] Saravia Tr. 149:15 – 149:17.

assistance as the crypto teacher."[30] Passwords were "individually managed by the device owner . . . each employee would manage their own computer."[31]

Mr. Chavez was in no way prepared to try to manage this chaotic mess. In 2021 his marriage was failing and after his falling out with Mr. Gomez, Mr. Gomez threatened him physically, so Mr. Chavez had to pretty much stop coming into the office. As Mr. Benvenuto testified, Mr. Chavez was "looking like he's stressed out" and "at that point, I knew something was up, and I could see the office becoming more disorganized as he did not appear – did not make appearances at the office any longer."[32] "CryptoFX, had evolved to the point they – they needed more bodies, they needed more staff. And unfortunately, because of what was going on in Mauricio [Chavez]'s personal life, he didn't witness what I witnessed."[33] The text messages produced are full of pleas to Mr. Chavez like, "Everybody is looking for you"[34] and "[I] have been trying to reach out multiple times and there has been no communication in return at all. . . . I understand you may be going through many things right now."[35] While Mr. Chavez would improve some with time and others, including Julio Taffinder (the son of Mr. Chavez's late partner, Eduardo Taffinder) and Mr. Benvenuto, tried to help out, the company was still mostly unmanaged. Julio Taffinder said that in his months at CryptoFX, he only saw Mr. Chavez in the office during business hours one time.[36]

CryptoFX's two-tiered referral system (also tracked primarily via the paper forms) and its two bonus programs complicated things further.[37] One witness testified that he had no idea what

[30] Taffinder Tr. 330:23 – 331:7.
[31] Taffinder Tr. 331:15 – 331:22.
[32] Benvenuto Tr. 49:12 – 49:24.
[33] Benvenuto Tr. 71:11 - 72:10.
[34] Ex. 9.
[35] Ex. 10.
[36] Taffinder Tr. 370:24 – 371:13.
[37] SEC Complaint [ECF No. 3] ¶ 21.

would happen to the referral fee if someone lost the paper form[38] and when he was asked how he kept track of commissions, he explained, "You cannot have ever something exact or a correct amount."[39]

As if all of that were not enough, the crypto rocket that had fueled the uncontrolled growth of CryptoFX, came crashing back to earth. The new "gold" that JP Morgan predicted could reach $146,000 and that Fidelity was allowing in its 401(k) accounts and that El Salvador had made legal tender, fell to about $20,500.[40] Despite those devastating declines, CryptoFX still paid returns to all its investors until it was shut down by the Receiver.[41] As the Receiver concedes, CFX "actually paid many [investors] 15-20% monthly returns on their investments."[42]

**E. The Candid Texts and Mr. Chavez's Investments Belie Any Claim of Fraud.**

In all of the evidence gathered to date, there is not a single reference to Mr. Chavez trying to target, or cheat, or defraud anyone. To the contrary, the evidence reflects Mr. Chavez and Mr. Benvenuto's concerns that the company might not be complying with TWC and IRS regulations and their desire to bring it into regulatory compliance and obtain a license from the SEC.[43]

Mr. Chavez also did not attempt to hide any assets. The few corporate entities he formed (using LegalZoom) are all registered in his own name on the records and website of the Texas Secretary of State.[44] The SEC itself alleges that the defendants "diverted several million dollars in investor funds to the Relief Defendant, CBT Group, LLC ("CBT Group"), a real estate

[38] Turcios Tr. 68:6 – 68:9.
[39] Turcios Tr. 70:17 – 70:20.
[40] Exs. 11, 12, and 13.
[41] Saravia Tr. 220:2 – 220:5; Benvenuto Tr. 194:14 – 195:1; Turcios Tr. 66:7 – 66:9.
[42] Receiver's Motion to Compel [ECF No. 71] at p. 3.
[43] Ex. 14.
[44] *See, e.g.*, Ex. 15; Ex. 16.

development company they co-own."[45] CBT was registered with both the Texas Secretary of State and the United States IRS with Mr. Chavez's name. CBT's primary assets are immovable real estate in Texas that the Receiver has had no difficulty locating. Indeed, the Receiver has already listed two of the properties for sale.[46] The Receiver also recovered over $440,000 of cash from the CryptoFX offices and over $3.5 million in various bank and crypto accounts.[47]

### F. Mr. Chavez is not Trying to Impede the Receiver.

In the investigation phase of this case, Mr. Chavez testified in deposition for a full day. On the same day that all of the assets of CFX were seized, Mr. Chavez spent hours at the CFX offices introducing the Receiver to people there and explaining what he knew of its operations. He even showed the Receiver CFX's security camera system and gave him the name of the person who set it up and who had the password to it. The Receiver seized a desktop computer that was in Mr. Chavez's office. The Receiver has now served 83 subpoenas and Mr. Chavez has not raised a single objection to a single one. So, it is not as though Mr. Chavez is trying to keep the Receiver from discovering records it may need. But Mr. Chavez has rights under the Fourth and Fifth Amendments and the attorney-client privilege that he obviously wants to preserve.

## III. Argument and Authorities

### A. Mr. Chavez's Constitutional Rights

This Court was careful to note in its orders and in its comments at the hearing regarding appointment of the Receiver that the Receiver "shall not have the power to waive the Fifth Amendment rights of the individual defendants; nor can he compel a waiver of their attorney-client

[45] SEC Complaint [ECF No. 3] ¶3.
[46] Receiver's First Interim Report [ECF No. 33] ¶ 25.
[47] Receiver's First Interim Report [ECF No. 33] ¶¶ 4 and 15 and [ECF No. 33-9] at 2.

privilege."[48] "The receiver can't waive the privilege either. . . I think he would know that instinctively, but if he didn't, I'm saying it now."[49]

The Receiver argues at some length that the business records it seeks are records of CryptoFx, which is a collective entity that does not have Fifth Amendment rights.[50] To be clear, Chavez is not attempting to assert any Fifth Amendment privilege on behalf of CryptoFX or any other collective entities. The Receiver also argues that the records were created voluntarily and therefore they are not protected by the Fifth Amendment,[51] but again, Chavez is not claiming that the records themselves are protected by the Fifth Amendment. What Chavez is asserting is that the act of producing his laptop and cell phones is testimonial and that is protected by the Fifth Amendment. As the Receiver acknowledges in its motion, "The Supreme Court has held that '[t]he act of producing evidence in response to a subpoena . . . has communicative aspects of its own, wholly aside from the contents of the papers produced.' *Fisher [v. United States]*, 425 U.S. [391] at 410. And 'compliance with a request for evidence may 'tacitly concede[] the existence of the documents demanded and their possession and control by the [defendant].' *Id*."[52] As the Receiver further candidly acknowledges, "'When the production of evidence does concede the existence, custody, and authenticity of that evidence, the Fifth Amendment privilege against self-incrimination applies because that production constitutes compelled testimony.' *United States v. Apple MacPro Computer*, 851 F.3d 238, 247 (3d Cir. 2017)."[53] Where the Receiver and Chavez disagree is that the Receiver argues that the act of production privilege does not apply under the foregone conclusion doctrine.

---

[48] Order Appointing Receiver [ECF No. 11] ¶ 7L.
[49] September 29, 2022 Hearing Transcript at p. 16.
[50] Receiver's Motion to Compel [ECF No. 71] at pp. 12-15.
[51] Receiver's Motion to Compel [ECF No. 71] at pp. 15-16.
[52] Receiver's Motion to Compel [ECF No. 71] at p. 17.
[53] Receiver's Motion to Compel [ECF No. 71] at p. 17.

### B. Some of the Receiver's Claims about the Devices and Passwords are not Correct.

Some of the Receiver's factual assertions regarding the materials the Receiver seeks are not actually correct. First, it should be noted that the laptop and two cell phones at issue were Mr. Chavez's personal devices.[54] He purchased them with his own funds. They were not purchased by CryptoFX.[55] Second, while the Receiver asserts that "it is uncontroverted that Chavez used his cell phone and WhatsApp to communicate with his employees, business partners, sponsors, and investors,"[56] that is only true for one of the two cell phones. With the explosion of activity at CryptoFX, Mr. Chavez purchased a second cell phone that he used only for personal matters. Third, the Receiver states that "Chavez's production of the passwords to the CryptoFX Google Drive and the devices is not testimonial because Chavez's knowledge of the passwords is a 'foregone conclusion.'"[57] That is not correct, at least as to the CryptoFX Google drive. The undersigned counsel's understanding is that someone at CryptoFX set up access to the Google drive on Mr. Chavez's laptop for him. The password may be resident on Mr. Chavez's laptop and the person who set it up may know the password, but counsel's understanding is that Mr. Chavez does not.[58]

---

[54] Mr. Chavez has a legitimate privacy interest in the devices he purchased. He has never given the Receiver or anyone else permission to access their contents. To this day, the devices are protected by passwords.

[55] The Receiver does not contest Chavez's claim that the devices contain personal and intimate information and the Receiver concedes that such information should be redacted from any production. (Receiver's Motion to Compel [ECF No. 71] at 12).

[56] Receiver's Motion to Compel [ECF No. 71] at p. 8.

[57] Receiver's Motion to Compel [ECF No. 71] at p. 17.

[58] This is similar to how the security system at the Blalock office was set up. The password was created by the person who installed the system. Mr. Chavez provided the Receiver with that person's name and number and the password when the Receiver came to that office with Mr. Chavez.

**C. The Receiver Has Not Described the Materials Sought with the Particularity Required for the Foregone Conclusion Exception.**

The Receiver does not and cannot contest that for the foregone conclusion exception to the act of production privilege to apply, "the Government must be able to 'describe with reasonable particularity' the documents or evidence it seeks to compel." *United States v. Apple MacPro Computer*, 851 F.3d 238,247 (3d Cir. 2017) (quoting *United States v. Hubbell*, 530 U.S. 27, 30 (2000)). In the leading appellate court opinion on this issue, the Eleventh Circuit found that "the decryption and production of the hard drives would require the use of the contents of [the Defendant's] mind and could not be fairly characterized as a physical act that would be nontestimonial in nature." *In re Grand Jury Subpoena*, 670 F.3d 1335, 1346 (11th Cir. 2012). The court also rejected the application of the foregone conclusion doctrine because the government could not show that it knew with any specificity what was on the hard drives. 670 F.3d at 1347. In doing so, the court relied upon the Supreme Court's holding in *United States v. Hubbell*, 530 U.S. 27 (2000), that the government would have to show it knew of the existence and location of the files it seeks and held that "[t]he Government cannot cure this deficiency through the overbroad argument that a businessman like respondent will always possess general business and tax records that fall within broad categories described in this subpoena." 670 U.S. at 45.

But the Receiver here seeks the wholesale turnover of Mr. Chavez's personal devices claiming that they contain "business records" of CryptoFX. Those devices most certainly contain personal and intimate information and the Receiver has identified few if any specific files that are supposed to be on those devices. The Receiver states only that Mr. Chavez had used his phone (without specifying which one) and his laptop to conduct CFX business and that he used his laptop to access CFX's Google cloud drive. The closest the Receiver comes to identifying even a type of file that might be on the devices is when he claims that "Leader Spreadsheets" were on the

Google drive, but the Receiver does not even claim that Mr. Chavez downloaded any such Leader Spreadsheets to his laptop.[59] Thus, all the Receiver offers is the sort of "categorical requests for documents the Government anticipates are likely to exist" that "will not suffice," *In re Grand Jury Subpoena*, 670 F.3d at 1346, and the speculation that the laptop may have been used to access a shared drive and it might have been used to download "Leader Spreadsheets" from that cloud drive. What is, or isn't, on any of the devices is thus far from any foregone conclusion and it contrasts sharply with what the government showed in the *U.S. v Apple MacPro Computer* case the Receiver relies upon. In that case, the government had already found one unencrypted file of the sort they were seeking on the device and the defendant's sister had testified that the defendant had shown her hundreds of others using the same device. *U.S. v Apple MacPro Computer*, 851 F.3d 238, 248-49 (3d Cir. 2017).

The Receiver also relies upon this Court's own opinion in *United States v. Cheng*, 2022 WL 112025 (S.D. Tex. 2022). But the situation in *Cheng* was far different than the scenario now before the Court. Mr. Cheng was a defendant in a criminal case where the Court was considering a motion to suppress under the exclusionary rule. Mr. Cheng had already produced the devices and their passwords to the government, *Id.* at *6. The Court found that Cheng had engaged in an act of production and that his Fifth Amendment rights were violated, but denied the motion to suppress because it found that the discovery of the information was "inevitable." *Id.* at *9. In reaching that conclusion, the Court considered such facts as that an arrest warrant had already been issued for Mr. Cheng, the government was already aware of certain contents that would be on the devices, the agents had obtained a search warrant prior to searching the devices, and Mr. Cheng

---

[59] Receiver's Motion to Compel [ECF No. 71] at p. 7.

did not challenge the validity of that warrant. *Id.* at *2, *4 and *8 n.12;[60] *see also Apple MacPro Computer,* 851 F.3d at 241 (Government already had possession of the devices from executing a search warrant whose validity the defendant did not challenge.). Here, there has been no arrest and no search warrant and no showing that would justify disregarding Mr. Chavez's Fourth and Fifth Amendment rights.

**D. The Devices Likely Contain Attorney-Client Privileged Material.**

The devices the Receiver seeks may, and in some cases very likely will, have attorney-client privileged communications, including communications with the undersigned counsel.[61] These are not privileges belonging to CryptoFX or any other collective entity. They are communications with Mr. Chavez's personal counsel of the very sort this Court was careful to protect in its prior orders. The Receiver acknowledges that Mr. Chavez should be permitted to withhold such materials.[62]

Wholesale production of the entire devices would be a wholly unwarranted invasion of Mr. Chavez's privileges and his Constitutional rights under the Fourth and Fifth Amendments. At the very most, the Court should order Mr. Chavez to produce any Leader Spreadsheets on the laptop and any login credentials the laptop may contain for the Google Drive. This would substantially lessen the invasion of Mr. Chavez's privacy and constitutional rights and the burden of production. The devices could remain in the possession of the forensic expert who currently holds them in a secure location.

---

[60] *See also, Hoffman v. United States*, 341 U.S. 479, 486 (1951) (Fifth Amendment privilege extends not only to incriminating evidence, "but likewise embraces those which would furnish a link in the chain of evidence.")
[61] They may also contain attorney work product or otherwise privileged information.
[62] Receiver's Motion to Compel [ECF No. 71] at p. 12.

### E. The Records of Other Business Entities.

The Receiver also seeks to compel the production of records regarding Maurizzio Group LLC, JM Monarchy LLC, Hair News Color N Cuts, LLC,[63] and Luxury Real Estate, LLC.[64] These were entities established using LegalZoom.com. They have no offices (except a small, closed hair salon), no employees, no corporate minutes, and no bank accounts (other than those the Receiver already has). Mr. Chavez produced the corporate formation documents for Maurizzio Group and CBT Group to the SEC during its investigation and Mr. Chavez sent the Receiver the company agreement for Hair News. Aside from such corporate formation documents that the Receiver already has or could obtain from the Secretary of State's website (or from LegalZoom), Mr. Chavez has no documents.[65]

## IV. Conclusion

For the reasons stated above and in Mr. Chavez's prior briefing,[66] the Receiver's Motion should be denied, or at most, Mr. Chavez should be ordered to produce any Leader Spreadsheets on his laptop and any login credentials for the Google shared drive that are on the laptop.

[63] The SEC already knew about Mr. Chavez's purchase of this hair salon for $30,000 when it filed this action. (See Complaint [ECF No. 3] ¶ 40). As counsel previously informed the Receiver, before this action was filed the salon had already been shut down after the stylist moved away and the salon had a bank account at Regions Bank with a few hundred dollars that was seized by the Receiver. (See Ex. 17). The Receiver has already obtained documents confirming this from Regions Bank

[64] Receiver's Motion to Compel [ECF No. 71] at pp. 9-11.

[65] JM Monarchy and Luxury Real Estate each owned a house. The Receiver already knows about that and has the records relating to those houses.

[66] ECF Nos. 45, 51, and 61.

Respectfully submitted,

By: */s/ Paul D. Flack*

Paul D. Flack
TBA # 00786930
SD Texas ID No. 17461
pflack@prattflack.com
Pratt & Flack, LLP
4306 Yoakum Blvd., Suite 500
Houston, TX 77006
(713) 705-3087

**Counsel for Defendant Mauricio Chavez**

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was served on all counsel of record via the Court's CM/ECF electronic service of process on or before May 16, 2023.

Paul D. Flack